[Civil No. 2790. Filed February 18, 1929.]

[274 Pac. 779.]

SOUTHERN PACIFIC COMPANY, a Corporation; CLAUDE J. MABEN and FRED E. WOODWORTH, Appellants, v. MARY VIRGINIA FISHER (PLENZ), Administratrix of the Estate of HARRY L. FISHER, Deceased, Appellee.

See Evidence, 23 C. J., sec. 1787, p. 45, n. 99.

Railroads, 33 Cyc., p. 971, n. 31, p. 1004, n. 6, p. 1062, n. 47, p. 1092, n. 56, p. 1104, n. 33.

Mr. Francis M. Hartman, for Appellants.

Mr. A. Van Wagenen, Jr., and Mr. W. L. Barnum and Mr. E. J. Flanigan, for Appellee.

ROSS, J—The widow and administratrix of Harry L. Fisher brought this action against the Southern Pacific Company, its engineer, Claude J. Maben, and its fireman, Fred E. Woodworth, charging them with negligently causing the death of said Harry L. Fisher in a collision at a railroad crossing in the town of Casa Grande, Pinal county, Arizona.

The specific acts of negligence are set out in her complaint as follows:

" . . . Said defendant sounded no whistle, nor any bell for eighty rods and more, nor at all, on the immediate approach and immediately back of said crossing; . . . that said train was . . . traveling at a very high rate of speed, to-wit: thirty-five miles an hour or more; that by reason of said rate of speed, and by reason of the fact that the said engineer or train sounded no whistle nor rang any bell, nor gave any warning of its approach, the said Harry L. Fisher, though using due care and caution . . . was by said locomotive and train run into and the automobile in which he was then riding .... collided with and was demolished," and injured said Harry L. Fisher so that he died; "that the direct, immediate

and proximate cause of the injury to, and the death of, said Harry L. Fisher, was the negligent omissions of said defendant to sound any whistle or ring any bell or give any warning of the approach of said engine, or train, as above specifically set forth.''

The defendants answered separately by general denials, and the railroad company in addition alleged that the accident and death were caused solely by the gross negligence and fault of the deceased.

The plaintiff had a verdict and judgment against the defendants for $10,000. They have appealed from the order overruling their motion for a new trial, and from the judgment.

There are sixteen assignments of error. Under the one that the court erred in denying defendants' motion for a directed verdict at the close of defendants' case, we shall examine the transcript of the testimony with a view of determining if there is any substantial evidence to support the allegations of negligence. If not, or if it shall appear therefrom that the decedent's death was due to his sole negligence, it will not be necessary to consider the other assignments.

We first direct attention to the allegation of negligence charged in the complaint and the issues therein tendered. There is no general allegation of negligence and the specific negligence relied on is, to say the least, rather peculiarly phrased. Omissions to warn, and the speed of the train, are in one place stated to have been the cause of the death of plaintiff's intestate, and in another it is stated that the omission to warn was the ''direct, immediate and proximate cause of the injury and the death.'' The exact language in the first allegation is ''that, by reason of said rate of speed, and by reason of the fact that the said engineer or train sounded no whistle nor rang any bell, nor gave any warning of its approach,'' the deceased was run into. The com-

bination of these two delicts is assigned as the cause of the injury and death.

The failure to give warning of the approach of a train to a public crossing by blowing the whistle or ringing the bell is, under the statutes of this state, negligence *per se* (*White* v. *Arizona Eastern Ry. Co.*, 30 Ariz. 151, 245 Pac. 270), regardless of the speed of the train. But the converse is not true. We have no statute, and the town of Casa Grande had no ordinance regulating the speed of trains. In the absence of such regulation, speed alone is not negligence. *Larrabee* v. *Western Pac. Ry. Co.*, 173 Cal. 743, 161 Pac. 750; 22 R. C. L. 1011, § 242. Evidence supporting the allegation of speed is not enough to make out the case alleged. It must go further and show that the omission to warn by signals, and the rate of speed, combined to cause the injury and death. Such is the allegation. But that the theory of the complaint was the omission to give warning by proper and adequate signals is manifest by the following allegation thereof:

"That the direct, immediate and proximate cause of the injury to, and the death of, said Harry L. Fisher, was the negligent omissions of said defendant to sound any whistle or ring any bell or give any warning of the approach of said engine, or train, as above specifically set forth."

Bearing in mind the particular kind of negligence that is alleged, we state the pertinent evidence upon that issue.

The accident occurred on August 18, 1925, at about 8:40 A. M., at what is known as the Florence Street crossing in the town of Casa Grande. The defendant company's track runs through the town in an easterly and westerly direction, and crosses Florence Street at right° angles. The train was headed west, while the deceased approached the crossing from the north,

on Florence Street, driving a Ford truck. One thousand three hundred fifty feet east of Florence Street crossing there is another crossing known as the Williams crossing. One thousand fifty feet east of the Florence Street crossing, on the north side of the track, are the section, bunk, and pump houses, and the depot is about 300 feet west of Florence Street. North Main Street is north, and South Main Street south, of the track and intersect Florence Street at the same angle as the railroad track. On these two main streets are located business houses and residences facing the track.

The deceased and his wife, the plaintiff, lived about 350 feet southwesterly from the Florence Street crossing, south of the depot on South Main Street. The American Express office is in the same yard. The deceased had lived in Casa Grande six years, and at the time of the accident, and for three or four years prior thereto, was the agent of the express company. He was familiar with the Florence Street crossing; had passed over it many times every ·day in looking after the express business. He was an experienced driver of automobiles, in good health, and in the possession of all his faculties. The morning of the accident he went from his home and the express office to meet an eight o'clock passenger train. After meeting the train he made some calls on the north side of the track, and was on his way back to his home or the express office when he was killed. The evidence is that the atmospheric conditions were favorable to seeing and hearing.

That the deceased could have heard the approaching train, had he stopped and listened, and that, had he looked, he would have seen the train in ample time to have avoided the accident, seems certain. He was seen from the engine when he was 30 to 40 feet from the crossing. Conversely, he should have seen

the engine. He and the train were both within the vision of onlookers standing near the track, when he was from 35 to 40 feet from the railroad crossing, and the engine 600 feet. Of the twenty-one witnesses who testified in the case, only four said they did not hear the train's warning, and, as we shall see from their testimony, these were paying no attention to the train or deceased until after the accident.

The plaintiff, testifying as a witness in her own behalf, said that she was standing in front of the express office waiting and looking for her husband when she heard the train whistle at the Williams crossing—1,350 feet east; that again it whistled twice, the second whistle being a long one, along about the end of the section-house (1,050 feet east of the Florence Street crossing); that she saw the deceased about that time driving south across North Main Street along Florence Street, at about fifteen miles an hour, towards Florence Street crossing; that, because of two cars on the track just west of the crossing, she lost sight of deceased for a few seconds, and as he came in sight the train frantically whistled, and then she said she realized he was going to be hit. She did not say whether she heard the bell ringing or not.

S. J. Norman, testifying for plaintiff, said he was looking after a cement mixer, located on Florence Street between the crossing and the north side of North Main Street, and putting sidewalks and curbs down on Florence Street; that the mixer was making a lot of noise at the time; that his attention was directed particularly to his work; that he was trying to attend strictly to his own business; that he did not hear the bell ringing; that he did not know whether it was rung or not; that he heard the whistle just before the crash, but not before; that the train was going from 30 to 35 miles per hour, according to his judgment.

David Kelsa, for the plaintiff, testified that he was going to Earl Bayless' garage to get a small punch for his auto, and was in front of a pool-hall on the north side of the track when he heard the train whistle at what is known as the Williams crossing; that he heard but one whistle before it reached the Florence Street crossing, when it whistled again; that the train was going 45 miles an hour.

Esther Fritsinger, for the plaintiff, testified that she saw Harry Fisher going down Florence Street towards the railroad track; that she did not see him when he was struck; that the last she saw of him he was near the track; that she entered Harmon's store and was talking to Mrs. Harmon when she heard a terrible crash. She heard no train or whistle.

W. C. McNatt, for the plaintiff, testified that the deceased was at his blacksmith-shop on Florence Street, one block north of North Main Street, just before the accident. The last he saw of the deceased he was about the middle of the block from Main Street going towards the railroad track, and he heard some whistling. Deceased was traveling 8 or 10 miles an hour. He heard the whistling and, in a few seconds, the crash.

Earl Bayless, for the defendants, testified that, from a point about ½ mile east of the Florence Street crossing, he, in his automobile, was going along North Main Street parallel with the moving train; that the train whistled for the Williams crossing; that the bell was ringing at that time, and over the crossing it whistled for the board; that it whistled four times; that shortly after that he heard other whistles; that he heard the bell and saw it ringing; that the train was traveling faster than he was, and when it reached the Florence Street crossing he was some fifteen cars back from the engine.

H. M. Snyder, for the defendants, testified that he was visiting with Mr. A. L. Hoffman in front of a confectionery store, one or two doors west of the crossing at Main and Florence Streets—approximately 200 feet from the crossing; that he heard the train whistling before it reached Casa Grande, also heard the bell ringing; that he saw the Fisher truck approaching the crossing; that he heard four whistles, probably 20 or 30 seconds apart, up near the bunkhouse; that he then heard two sharp whistles just before the crash; that he saw the deceased driving along Florence Street at the time he heard the train coming; that deceased was going south and looking towards the express office, towards the west, in the direction away from the train; that he first saw him about the middle of the crossing on North Main Street, and that was the time he heard the train whistle.

A. L. Hoffman, for the defendants, testified that he was sitting in front of his confectionery store talking to H. M. Snyder when he heard some whistling and the rattle of the train; that it was then close to the bunkhouse; that he then noticed Mr. Fisher going on Florence Street towards the crossing; that that was a short time after he heard the train whistling; that he heard the whistle several times; that several sharp whistles were blown before the train struck Fisher; that the first whistle he heard was in the vicinity of the Williams crossing; that he then heard more whistles; that he kept watching Fisher as he approached the railroad; that he seemed to stop for an instant when he first got to the track—it seemed he attempted to stop; that he could see him very well, and that, between the time he first saw the truck and the time it was struck, it had progressed 150 or 200 feet.

Harry J. Wilson, for the defendants, testified that he was attending a service station about 50 yards from where the accident happened; that he heard the train whistle when it was coming into town, and again when it got up closer, and again just before he heard the crash.

R. Shearer, for the defendants, testified that he was at his barber-shop near the intersection of Main and Florence Streets at the time of the accident; that he heard two whistles before he saw Fisher; that he saw Fisher approach the railroad crossing and at the same time heard the noise of the train; that he heard quite a little whistling going on; that Fisher was 20 or 30 feet from the crossing when he heard those whistles; that Fisher pulled his car to the right, back west, in an effort to escape the collision; that at that moment all he could see was dust; that he heard enough whistling prior to that time to attract his attention in his shop where he was shaving a patron.

Charles C. Holt, for the defendants, testified that he was in front of the Shearer barber-shop; that shortly prior to the accident he heard the train coming from the east, heard it whistle several times; that some were longer than others; that he saw Fisher going south across the railroad at Florence Street, heard the whistle, and then saw Fisher going up towards the track; that, when he first heard the train, it was up the track towards Tucson; that he saw the smoke and saw the train and heard the whistles several times.

C. A. Smith, for the defendants, testified that he was running a service station about a block north of the section-house on North Main Street, and about one block east of the Williams crossing; that he saw and heard the train on the morning of the accident; that the train commenced whistling east of the sec-

tion-house for the crossing; that it kept on whistling after it passed his place of business; that it kept on whistling after it passed the section-house; that he heard it very plainly; that he did not count the number of whistles; that they were mighty near continuous; that the train was making so much noise that he and his companion could not understand each other.

A. L. Elliott, for the defendants, testified that he was a telegrapher for the Southern Pacific, employed at Casa Grande; that he had copied an order for this extra freight train, and heard them blow for the station; that he had given train order to the dispatcher, cleared the train, and was standing outside of the station watching Fisher and the train; that Fisher was driving south on Florence Street; that the train was about 600 feet from the crossing, and Fisher 35 or 40 feet; that, when he heard the emergency whistle, he figured that Fisher would stop on the house track, about 8 or 10 feet from the main line; that he first heard the train whistle at the mile station board located east of town; it whistled for that crossing, for the Williams crossing, and four times for the semaphore board; that the train was then a little west of the Williams crossing; that, when he heard the warning whistle, Fisher was about 30 feet back from the track.

A. E. Calhoun, for the defendants, testified that he was a rear brakeman on the freight train; that he heard the whistle for the mile board, for the crossing, and four long blasts from train orders; that it was an exceedingly loud whistle.

H. E. Richardson, for the defendants, testified that he was a brakeman on this extra freight train; that he was riding on the engine tank at the head end of the train; that the engineer whistled for the station, for the two crossings, and for the order board; that the

bell started ringing about a quarter of a mile east of the Williams crossing, and continued to ring clear up to the Florence Street crossing.

J. H. Hamilton, for the defendants, testified that he was the head brakeman, riding on the tank of the engine; that the whistle was sounded for the station mile board, two crossings, and also for the order board; that the bell commenced ringing east of the Williams crossing, and continued to ring until the engine passed Florence Street crossing.

Defendant C. J. Maben, for the defendants, testified that he was the engineer of the train; that he whistled for the station mile board, for the two crossings, and four long blasts for the order board; that the fireman turned on the automatic bell ringer east of the Williams crossing, and the bell continued to ring until the engine passed the Florence Street crossing and until the engine stopped; that he was 5, 6, or 7 car-lengths from Florence Street when he saw the Ford truck moving towards the track, possibly 30 or 40 feet from the main line; that the man sitting in the truck had his head turned in the opposite direction; that he jerked the whistle cord to attract the man's attention; that the man looked around and ran directly in front of the engine.

Defendant F. E. Woodworth, for the defendants, testified that he was the fireman on the train; that the engineer whistled for the station mile board, the two crossings, and four long blasts for the order board; that he turned on the automatic bell ringer east of the Williams crossing, and the bell continued to ring until the engine passed the Florence Street crossing.

The summation of the evidence is that the train signaled its approach to the Florence Street crossing by whistling, beginning at a point about 1 mile east of Casa Grande, repeated it for the Williams crossing and again opposite the section-house, and finally

just before the collision; and by the ringing of the engine bell, beginning at a point before reaching the Williams crossing and continuing until the train stopped. There is no evidence that these signals were not given. The evidence that they were given stands undisputed. The plaintiff herself testified to hearing whistles at the Williams crossing, 1,350 feet, and at the section-house, 1,050 feet, from where her husband was struck. She did not pretend to say other blasts of the whistle were not given, nor that the bell was not rung. Norman testified he did not hear the whistle or the bell until just before the crash, but this is no denial that they were sounded. He says the cement mixer he was attending was noisy, and he was looking strictly to his own business, and did not know whether the bell was rung or not. Kelsa's and Fritsinger's testimony was negative, the latter stating that she heard neither the train nor the whistle, and the former that he heard the whistle once as it approached the Williams crossing.

All the testimony of the witnesses for the plaintiff, as to not hearing signals, was of a negative character. They did not say they were listening for signals or that there was anything that particularly attracted their attention to the train or its movements until the crash. Their testimony of not hearing the whistle or bell is not a denial that they were sounded. This negative testimony is of the kind mentioned in *Davis* v. *Boggs*, 22 Ariz. 497, 199 Pac. 116, as of no evidentiary value, as against positive evidence that signals were made.

Eight witnesses not in the employment of the defendant railway, and presumably disinterested, and seven employees, including the two defendants (the engineer and fireman), all testified that the whistle was sounded many times, and several of them that the bell was rung continuously from a point east of the

Williams crossing until the train stopped. There is testimony that the deceased, as he approached the crossing, was looking west, away from the direction the train was coming, and that he seemed to stop or turn his car in the direction away from the train. This was undisputed. Under the uncontradicted evidence, had he been paying attention, he should have been able to stop his automobile short of the track after the last sharp blasts of the whistle. He was at that instant, according to one witness, 30 or 40 feet, and another 20 to 30 feet, from the main line track, and the engine was from 300 to 600 feet from the crossing.

In *Robinson* v. *Oregon-Washington R. & Nav. Co.*, 90 Or. 490, 176 Pac. 594, a railroad crossing case, the court makes the following very sensible, correct, and just observation on the duty of the traveler when approaching a railroad crossing:

"If from a place of safety on his way, the traveler in control of the vehicle in which he is riding can obtain a view of the coming train, he must look upon the course of the train from that point, and this responsibility is constant until the danger is past; that is, until he is safely across the railway track. The duty is constant because the danger is incessant. Instead of being intermittent it grows as the traveler gets near the crossing and reaches its climax only as he actually crosses the track in his passage. This obligation he owes not only to himself, but also to those on the train, whether passengers or the laborers employed in its operation. He must not allow his selfish little convenience to override this duty so well grounded in common sense.

"All the precedents make it incumbent upon the traveler both to look and listen. Neither of them can be eliminated, without its use is practically impossible. The law does not excuse him from exercising both of them, unless there is no reasonable opportunity for that purpose. There is quite as much reason for his stopping so he can see as for stopping

so he can hear, if there be any zone of safety from which he can see, and there are obstructions which prevent him from seeing a moving train without halting in that zone.''

Fisher acted like a deaf and blind man. No doubt he could have seen had he looked, and no doubt he could have stopped his automobile within the distance he was from the track when the train came within his vision, had he been paying attention to his safety. It is evident he neither looked nor listened, although he knew the crossing and that it was a dangerous place.

There is absolutely no evidence of the negligence charged in the complaint as the ''proximate cause of the injury and death of the said Harry L. Fisher.'' On the contrary, the evidence conclusively shows that his death was proximately caused by his own inattention, indifference, and negligence. The evidence fails to show that the defendants were guilty of any negligence whatsoever, but, if they were negligent in a manner not charged in the complaint, it would be no basis of recovery. The plaintiff having bottomed her right of action upon the failure to blow the whistle or ring the bell ''for eighty rods and more, nor at all, on the immediate approach and immediately back of said crossing,'' and the failure to give any warning of the train's approach, limited her right of recovery, and she was bound to establish by a preponderance of the evidence that specific allegation.

In the early case of *Santa Fe & P. Ry. Co.* v. *Hurley*, 4 Ariz. 258, 36 Pac. 216, we said, speaking through Mr. Chief Justice BAKER: ''The rule is very well established that, if the plaintiff specifically plead the act or acts constituting the defendant's negligence, he cannot prove other and different act or acts for the purpose of substantiating his complaint.'' The same doctrine was announced in *Southwest Cotton Co.* v. *Pope*, 25 Ariz. 364, 218 Pac. 152, and in *White* v. *Arizona Eastern Ry. Co., supra.* In *Martin* v. *Pacific*

*Gas & Electric Co.,* (Cal. App.) 255 Pac. 284, the same rule is stated and cases from several states collated.

It appears to us that the plaintiff wholly failed to support her allegations of negligence, and that the court should have directed a verdict at the close of the case on the motion of the defendants.

The judgment is therefore reversed, and the cause remanded, with directions to dismiss the complaint.

LOCKWOOD, C. J., and McALISTER, J., concur.