[Civil No. 3370. Filed July 14, 1934.]

[34 Pac. (2d) 423.]

ILLINOIS BANKERS' LIFE ASSOCIATION, a Corporation, Appellant, v. ANNA THEODORE, Executrix of the Last Will and Testament of the Estate of HARRY B. LAGOS, Deceased, Appellee.

Messrs. Armstrong, Kramer, Morrison & Roche, for Appellant.

Mr. V. L. Hash, for Appellee.

LOCKWOOD, J.—This is an action by Anna Theodore, hereinafter called plaintiff, as executrix of the last will and testament of Harry B. Lagos, hereinafter called deceased, against Illinois Bankers' Life Association, a corporation, hereinafter called defendant, for the recovery of $2,500 on account of a certain life insurance policy written by defendant, as insurer, upon the life of deceased. Defendant pleaded in abatement of the action that the plaintiff in her individual capacity was a necessary party by reason of a certain assignment made to her by the deceased in his lifetime and delivered to and accepted by the defendant, and defended on the merits on the ground that the policy never took effect because it was not delivered to deceased while he was in good health, and that its issuance and delivery were procured by false and untrue material statements and representa-

tions made by deceased to the medical examiner of defendant. The case was tried to a jury, which rendered a verdict in favor of plaintiff for the full amount of the policy, and from such judgment this appeal was taken.

The undisputed facts in the case are as follows: Deceased, on the 13th day of November, 1929, made a written application to defendant for the issuance of the policy in question. This application contained, among other things, the following provisions:

"I hereby agree that the answers hereon (Part I) and all those I make to the Medical Examiner of the Association (Part II) in continuance of this Application are full, complete and true, and shall be the basis of, and a part of the consideration for, the policy for which application is hereby made.

"I agree that the insurance herein applied for shall not take effect until the first premium is actually paid and the policy is issued and delivered to me during my good health. I agree to submit to an examination by the Association's regular appointed medical examiner at his earliest convenience."

In part II of the application appear the following questions and answers:

"13. Are you now in good health and free from disease or injury? *Yes.*"

"20. Have you ever changed your place of residence for the purpose of benefiting your health? If so, state particulars. *No.*"

"28. Have you ever had any diseases of the following named organs, or any of the following named diseases or symptoms? (Do not use ditto marks) Appendicitis, no; Abscess, no; Apoplexy, no; *Asthma, no;* Bronchitis, no; Cancer, or other tumors, no; Chronic diarrhea, no; Consumption, no; Delirium tremens, no; Difficult, excessive or scanty urination, no; Discharge from Ear, no; Disease of Bladder, no; Dizziness or vertigo, no; Dropsy, no; Indigestion, no; Enlarged veins, no; Fits, no; Gall stones, no;

General debility, no; Habitual headaches, no; Heart disease, no; Jaundice, no; Kidney disease, no; La Grippe, no; Affection of liver, no; Neuralgia, no; Paralysis, no; Piles or fistula, no; Pleurisy, no; Pneumonia, no; Rheumatism, no; *Spitting blood or other hemorrhage, no;* Stricture, no; Skin, no; Sunstroke, no; Syphilis, no; Swelling of limbs, or face, no; Urinary organs, no; or any other disease or injury, no." (Italics ours.)

After these questions and answers appeared the following:

"I represent on behalf of myself and of any person who shall have or claim any interest in any policy issued hereunder, each of the above answers to be full, complete and true, and that I am temperate, and to the best of my knowledge and belief in sound physical condition and a proper subject for life insurance."

And the application was signed by deceased and the policy issued thereon in the due course of business, as of November 19, 1929. Thereafter, and on May 8, 1930, deceased, by a written instrument, assigned his interest in the policy to Anna Theodore, being the same Anna Theodore who is plaintiff in the present case as executrix, and this assignment was sent by her to defendant and by it accepted.

On May 22, 1931, deceased died of pulmonary tuberculosis, the contributing cause being given in the death certificate as abscess of the lungs.

On June 1st Theodore made claim to the proceeds of the policy in a proof of death, stating that the capacity in which she made the claim was both by assignment and by the last will of the deceased, under the terms of which she was the sole legatee of deceased. There are other matters which are disputed, and we shall refer to them from time to time as seems necessary in the course of this opinion.

The plea in abatement was presented to the court on the theory of defendant that, since the policy had been formally assigned to Theodore as an individual, and she was a married woman at the time, by such assignment its proceeds became community personal property of herself and husband, and that she therefore could not dispose of it. It was urged by defendant that since only the husband under our statutes can dispose of community personalty, a recovery by plaintiff in her capacity as administratrix and legatee would not bar a second recovery by her husband on the same policy.

The evidence is in conflict in regard to whether or not the assignment was actually in force or not at the time deceased died; but since the case must be reversed on other grounds, we content ourselves by saying that if defendant requests it the trial court will doubtless order both Anna Theodore in her individual capacity and her husband to be made parties to the action, so that under no circumstances could defendant be required to pay more than one judgment.

We consider next the legal propositions raised through defendant's assignments of error on the merits of the case, in their logical and not numerical order. Proposition No. 4, as stated by defendant, reads as follows:

"In order for untrue statements in an application for life insurance and to the medical examiner to constitute a good defense to an action on the policy issued pursuant thereto, it need not be proved that they were in bad faith, or with intent to deceive, or were wilful, or fraudulent, but only that they were material."

Defendant claims that deceased's answers to the italicized portions of 13, 20 and 28 were false, and

it is argued by it under this proposition that the only important difference between a warranty and a representation in an application for life insurance is that a warranty false in fact makes the policy voidable at the option of the insurer, regardless of whether or not the fact warranted was a material inducement for the issuance of the policy, while a representation false in fact makes it voidable in case the facts represented were a material inducement to the insurer to issue the policy. It is plaintiff's contention, on the other hand, that in order that a false representation, as distinct from a warranty, should make a policy voidable, it must have been made willfully, fraudulently and in bad faith and with the intent to deceive the insurer, and that even gross negligence on the part of the insured in the making of a representation will not have such effect, unless it was made with intent to deceive.

Similar questions have been before the courts repeatedly, and the decisions represent practically every point of view from that taken by defendant to its antithesis insisted upon by plaintiff. We could find support in some jurisdictions for almost any position we might think proper, and the issue has never been specifically determined in Arizona. We are therefore at liberty to consider the logic and reasons supporting the various points of view, and to adopt that which seems most calculated under modern conditions to do justice to both parties. After a careful investigation and comparison of all of the cases cited both by plaintiff and defendant, and considerable independent investigation of our own, we think the better rule and the reasons thereof are well laid down in the cases of *Moulor* v. *American Life Ins. Co.,* 111 U. S. 335, 4 Sup. Ct. 466, 470, 28 L. Ed. 447, and *Schwarzbach* v. *Ohio Valley Protec-*

*tive Union,* 25 W. Va. 622, 52 Am. Rep. 227. The reasoning in both cases is so cogent and convincing that we feel we cannot improve thereon, and therefore quote from the Moulor case as follows:

"But it is contended that if the answers of the assured are to be deemed representations only, the policy was, nevertheless, forfeited, if those representations were untrue in respect of any matters material to the risk. The argument is that if the insured was, at the time of his application, or had been at any former period of his life, seriously or in an appreciable sense, afflicted with scrofula, asthma, or consumption, his answer, without qualification, that he had never been so afflicted, being untrue, avoided the policy, without reference to any knowledge or belief he had upon the subject. The soundness of this proposition could not be disputed if, as assumed, the knowledge or good faith of the insured, as to the existence of such diseases, was, under the terms of the contract in suit, of no consequence whatever in determining the liability of the company. But is that assumption authorized by a proper interpretation of the two instruments constituting the contract? We think not.

"Looking into the application, upon the faith of which the policy was issued and accepted, we find much justifying the conclusion that the company did not require the insured to do more, when applying for insurance, than observe the utmost good faith, and deal fairly and honestly with it, in respect of all material facts about which inquiry is made, and as to which he has or should be presumed to have knowledge or information. The applicant was required to answer yes or no as to whether he had been afflicted with certain diseases. In respect of some of those diseases, particularly consumption, and diseases of the lungs, heart, and other internal organs, common experience informs us that an individual may have them in active form, without, at the time, being conscious of the fact, and beyond the power of any one, however learned or skillful, to discover. Did the company expect, when requiring categorical answers as

to the existence of diseases of that character, that the applicant should answer with absolute certainty about matters of which certainty could not possibly be predicated? Did it intend to put upon him the responsibility of knowing that which, perhaps, no one, however thoroughly trained, in the study of human diseases, could possibly ascertain? . . .

"Suppose at the time of his application he had a disease of the lungs or heart, but was entirely unaware that he was so affected. In such a case he would have met all the requirements of that particular question, and acted in the utmost good faith, by answering No, thereby implying that he was aware of no circumstance in his then physical condition which rendered an insurance upon his life more than usually hazardous. And yet, according to the contention of the company, if he had, at any former period of his life, been afflicted with a disease of the heart or lungs, his positive answer to the seventh question, that he had not been so afflicted, was fatal to the contract; this, although the applicant had no knowledge or information of the existence at any time of such a disease in his system. So, also, in reference to the inquiry in the fourteenth question as to any 'constitutional infirmity' of the insured. If, in answering that question, he was required to disclose only such constitutional infirmities as were then known to him, or which he had reason to believe then existed, it would be unreasonable to infer that he was expected, in answer to a prior question, in the same policy, to guarantee absolutely, and as a condition precedent to any binding contract, that he had never, at any time, been afflicted with diseases of which, perhaps, he never had and could not have any knowledge whatever.

"The entire argument in behalf of the company proceeds upon a too-literal interpretation of those clauses in the policy and application which declare the contract null and void if the answers of the insured to the questions propounded to him were, in any respect, untrue. What was meant by 'true' and 'untrue' answers? In one sense, that only is true which is conformable to the actual state of things.

In that sense, a statement is untrue which does not express things exactly as they are. But in another and broader sense the word 'true' is often used as a synonym of honest, sincere, not fraudulent. Looking at all the clauses of the application, in connection with the policy, it is reasonably clear—certainly the contrary cannot be confidently asserted—that what the company required of the applicant, as a condition precedent to any binding contract, was, that he would observe the utmost good faith towards it, and make full, direct, and honest answers to all questions, without evasion or fraud, and without suppression, misrepresentation, or concealment of facts with which the company ought to be made acquainted; and that by so doing, and only by so doing, would he be deemed to have made 'fair and true answers.' "

In the Schwarzbach case we find the following language:

" . . . After a long controversy in England it may be now regarded as well settled there, that to make a vendor responsible in damages for a representation, which turns out to be untrue, it must be made *mala fide* and not in the *bona fide* belief that it is true. And this is supported by the weight of American authorities. See *Crislip* v. *Cain,* 19 W. Va. 471 and 472, where these English cases are all cited. But it should always in this connection be borne in mind, that, if one represents as personally known to him what is not true, though he may believe it, he has in contemplation of law acted *mala fide,* and is guilty of a legal fraud though he may in point of fact have acted *bona fide;* and in such a case he is responsible for any injury resulting from his false representation. (Citing cases.) These cases are cited and this doctrine considered and approved in *Crislip* v. *Cain,* 19 W. Va. 491 to 493.

"This doctrine has peculiar and special application to policies of life-insurance; for it is obvious, that most of the facts set out especially in the applications now generally attached to the policy and expressly made a part of it are facts peculiarly within the knowledge of the insured and, whether he says so or

not, must be regarded as stated on his own personal knowledge, and hence with reference to most facts, especially when stated in answer to questions propounded to him, he must be regarded as making them on his own personal knowledge and as being by him intended to be so understood by the insurer. This being the case, if a part of this description is untrue in point of fact, he is guilty of legal fraud, though he may not have intended to deceive, and really did not act *mala fide* in point of fact. But sometimes facts are stated by the insured, which the insurer must from the nature of the fact stated have known were not stated as facts absolutely true and within the personal knowledge of the insured. When the fact stated is of this description, on the principles we have laid down the policy should not be avoided, merely because the statements turn out afterwards to be in point of fact untrue, if the statement was made in perfect good faith and with the full belief, when the statement was made, that it was true. Of this character would be a statement in an application that the insured was of 'sound body'; for of course the insurer must have understood such a statement as made not upon the personal knowledge of the insured, but upon his belief from all the knowledge he had of his constitution. For of course men sometimes believe they are of 'sound body,' when in point of fact they have some 'internal disease,' which in its character is fatal. When such a statement as this is made in an application for a life-policy on the principles we have laid down the policy is not forfeited, if the statement turns out to be untrue, if, when it was made, the insured believed, that he was of 'sound body' and had no suspicion, that he was the subject of an 'internal disease' fatal in its character. If on the other hand, the insured in his application should state in answer to a question, that he had not had a serious illness for seven years, this statement the insurer must have regarded as made on his own personal knowledge; and if in point of fact it was untrue, on the principles we have stated it must forfeit the policy, though he did not make the statement in point of fact *mala fide,* that is, with a purpose of de-

ceiving, but only from thoughtlessness or forgetfulness, or because he had forgotten that a serious illness, which he had had, was within seven years.

"I apprehend that the conflict of authorities on the question, whether there must be fraud in a misrepresentation of a fact in order to avoid a policy, has arisen principally from a failure to distinguish between actual fraud, that is, a misstatement of a fact made with the intention of deceiving, and legal fraud, which is a misstatement of a matter within the personal knowledge of the insured or of such a character, that the insured must have regarded it as within the personal knowledge of the insured. Such a misstatement of a matter of this character is a legal fraud, though it was not made with intent to deceive. And I apprehend the law to be that a misrepresentation of a fact made by the insured, whether such misrepresentation be an actual fraud or a legal fraud, will avoid a policy; but if there be an absence of all fraud legal or actual in the misrepresentation of a fact, such misrepresentation will not avoid a policy."

It will be noted that the Moulor case discusses the rule to be followed where the matter is one of opinion only, while the Schwarzbach case points out the difference between statements of opinion and knowledge and the different rules to be applied thereto. We hold, therefore, that under the law of Arizona, a false representation in an application for an insurance policy will not make voidable the policy, unless the insured has been guilty of either legal or actual fraud in making it; that if the question is one where the facts are presumably within the personal knowledge of the insured, and are such that the insurer would naturally have contemplated that his answers represented the actual facts, if the representation be false, the insured is guilty of legal fraud, although as a matter of fact he may not have intended to deceive the insurer; but that where the question is of such a nature that a reasonable man would know

that it represented merely the opinion of the insured, there must be an actual intent to deceive and bad faith on the part of the insured. We need not set forth the instructions of the trial court, but applying this test it is obvious that they were erroneous and misleading in the highest degree. No distinction was made therein between representations of fact and representations of opinion. Particularly is this true as to the statement that the grossest carelessness on the part of the insured in ascertaining the truth of his statements is immaterial, in the absence of actual intent to deceive. Such cannot be the law. It is almost universally held that statements made with reckless disregard of the truth are equivalent to those intentionally false in character.

Of the questions answered by the insured above set forth, the ones in regard to the spitting of blood and the change of residence for health purposes were matters of fact within the knowledge of the insured, and not of opinion, and were of a character on which the insurer had the right to rely upon as true. Obviously they were both material in the highest degree. While the spitting of blood is not always a sign of serious disease such as would cause an insurer to refuse to accept the risk, it is notoriously one of the danger signals suggesting the possibility of tubercular infection of the lungs, and perhaps the first symptom of that disease that would be noticed by a layman. Such being the case, any insurer on being told that the insured had spat blood would in all probability, before issuing a policy, make the most careful and detailed examination of the applicant. At least if such were the fact it was entitled to know it, so as to determine its future action. The same is true in regard to a change of residence for health purposes. We hold, therefore, that the case must be

reversed because the instructions as to the character of false representations required to make a policy voidable, when taken as a whole do not fairly and adequately state the law of Arizona.

It is not essential that we pass on all of the other legal propositions raised in order to determine the result of this appeal, but since the question suggested by one of them will probably arise at a new trial, we discuss it also. It is stated by defendant as follows:

"Where credible witnesses with apparently adequate opportunity for observation testify to a condition, occurrence or state of facts, no conflict arises by the negative testimony of other witnesses, and the court should direct a verdict."

The questions are: (a) May a jury disregard the uncontradicted testimony of an unimpeached and credible witness, and (b) is negative testimony alone sufficient to constitute a contradiction? We have had the first question under consideration in the cases of *Crozier* v. *Noriega,* 27 Ariz. 409, 233 Pac. 1104, and *Otero* v. *Soto,* 34 Ariz. 87, 267 Pac. 947, 949. In the last-named case, after quoting from the first one, we say:

"In other words, if any circumstances appear in the case which would justify a reasonable man in discrediting the statement of a witness, the jury may refuse to believe it, even though it is not directly challenged, but they may not arbitrarily reject uncontradicted evidence when nothing intrinsic in the evidence itself or extrinsic in the circumstances of the case casts suspicion thereon."

We have considered the second question in the cases of *Davis* v. *Boggs,* 22 Ariz. 497, 199 Pac. 116, and *Southern Pacific Co.* v. *Fisher,* 35 Ariz. 87, 274 Pac. 779. Those cases involved a question as to whether the testimony of witnesses that they did not

hear a bell ring or a whistle blown was sufficient to overcome positive evidence that such things did happen. We held, in substance, that mere negative testimony, with no proper accompanying and explanatory reasons in support thereof, is of no value as against positive evidence that a certain fact existed. We think that rule is obviously correct. Applying the rule of law to the facts in the present case, if witnesses whose interest and character are unquestioned testify positively that they saw deceased spit blood at certain times and places before the policy in question was issued, the mere testimony of other witnesses, equally honest, that they did not see him spit it at other times and places, would be of no evidentiary value as against the testimony of the first witnesses. In such a case plaintiff's only method of destroying the effect of defendant's evidence would be to attack the credibility of the witnesses who testified to the positive fact, or the reasonableness of their evidence. At a new trial the presiding judge will doubtless apply this rule to the evidence as it may then appear before him.

For the reason that the instructions of the trial court incorrectly stated the law of Arizona in regard to the effect of false representations, the judgment of the superior court of Maricopa county is reversed and the case remanded for new trial.

ROSS, C. J., and McALISTER, J., concur.