817 P.2d 44

**Wayne H. STEWART and Betty L. Stewart, husband and wife, Plaintiffs–Appellants, Cross–Appellees,**

v.

**MUTUAL OF OMAHA INSURANCE COMPANY, a Nebraska corporation, Defendant–Appellee, Cross–Appellant.**

1 CA–CV 89–048.

Court of Appeals of Arizona, Division 1, Department D.

Aug. 22, 1991.

Patten, Montague & Arnett by W. Dea Montague, Wayne C. Arnett, Tempe, for plaintiffs-appellants, cross-appellees.

Lewis & Roca by Susan M. Freeman, Jose A. Cardenas, Stephen M. Bressler, Phoenix, for defendant-appellee, cross-appellant.

## OPINION

TAYLOR, Judge.

Wayne H. and Betty L. Stewart appeal from summary judgment permitting Mutual of Omaha Insurance Company (Mutual) to rescind three insurance policies because of alleged misrepresentations in policy applications. The primary issues on appeal are whether the applications were fraudulent within the meaning of A.R.S. § 20–1109 and whether factual disputes concerning alleged misrepresentations by the Stewarts to Mutual's agents preclude summary judgment. Mutual argued that the Stewarts failed to disclose Wayne Stewart's "mental health history", contending that such failure to disclose constitutes a material misrepresentation entitling Mutual to rescind the policies pursuant to A.R.S. § 20–1109.

We find that there are disputed facts which are material to Mutual's statutory right to rescind. Therefore, we reverse the judgment and remand for further proceedings.

## FACTS

We state the facts in a light most favorable to appellant. *Griffith v. Faltz*, 162 Ariz. 599, 785 P.2d 119 (App.1990).

On May 21, 1985, Wayne Stewart saw a neurologist, Dr. David Suber. Stewart complained of stress, a shaking right hand when anxious, and general depression. He questioned whether his symptoms were associated with a 1967 water skiing accident which had resulted in a concussion with a prolonged period of coma. Dr. Suber's examination indicated generally normal physical and neurological results other than a mild right-side intention tremor and slow reading. To assure a more complete evaluation of Stewart's health, Dr. Suber ordered a battery of tests. The test results were normal. Dr. Suber prescribed Elavil for post-concussion symptoms and referred Stewart to Dr. Joseph Tursini, a clinical psychologist, for evaluation and counseling.

Stewart initially saw Dr. Tursini on June 17, 1985. He visited Dr. Tursini four more times over the next six weeks, but stopped going because he felt that he did not need professional help. Dr. Tursini diagnosed Stewart as having a cyclothymic disorder and mixed personality disorder but he did not notify Stewart of his diagnosis. Stewart was unaware of this diagnosis at the time of his statements to Mutual's agents.

During approximately the same time that Wayne Stewart was seeing Dr. Suber and Dr. Tursini, the Stewarts contacted an acquaintance, Peter Johnson (Johnson), for advice concerning a claim dispute that Mrs. Stewart was having with an insurance company. Johnson was a Mutual agent. On May 22, 1985, Wayne Stewart applied for life insurance through Johnson with United of Omaha, Mutual's life insurance affiliate. On June 20, 1985, he applied for income protection (disability) insurance from Mutual, also through Johnson.

Johnson filled out the application for disability insurance in Stewart's presence. The application contained the following questions:

13. Have you ... ever: (a) had, (b) been advised by a physician that you had or (c) received advice or treatment for: (Circle conditions answered "Yes" and give full details in 17 below.)

YES NO

\* \* \*

(3) [M]ental or nervous disorder.... ☐ ☐

\* \* \*

14. Other than above, have you ... within the past five years: (If "Yes," give details in 17 below.)

(1) Had any mental or physical disorder or bodily injury not listed above? ☐ ☐

(2) Had, or been told you had, or received advice or treatment for any symptoms of ill health? ☐ ☐

\* \* \*

16. Are you or any named dependent: (1) under observation or taking treatment or medication? (if "Yes," give details in 17 below.) ☐ ☐

Stewart answered each of these questions "no."

Next to question 14(3), "Had any physical examinations?", Stewart checked "Yes." In explanation of this response, information was written into the spaces provided that Stewart had consulted Dr. Suber. Under "date and reason for the last consultation", the reason given was "physical-work related."

Stewart had an opportunity to review the application and make any changes that he felt were appropriate at the time it was completed by Johnson.

An employee from Mutual's special services department later telephoned Stewart to verify independently that the application was complete and accurate. During that telephone conversation, the employee asked questions from a work sheet that were different from the application. She asked Wayne Stewart to identify (1) the last doctor he saw, (2) his regular physician and (3) whether he was on any medication. Stewart responded that he had no regular physician, was not on any medication and last saw a physician in March, 1980 for pain in his stomach.

Mutual sent Stewart a "reverification" letter on August 27, 1985, along with a copy of the application giving Stewart an opportunity to again review and correct any misinformation. The letter stated:

[We] ask that you carefully read your policy.

Your policy has been issued relying upon the information contained in your application. Your eligibility for benefits and the amount of benefits may well depend on it.

. . . .

If it is incomplete or inaccurate in any respect, please provide us with full additional information in the space provided below. . . .

Stewart signed and returned the letter under a form provision which states, "I received the application and find the answers to be correct and complete."

Stewart received the insurance policy with a copy of the application attached to the policy and incorporated as part of the insurance contract. The policy stated:

PLEASE READ

Please read the copy of your application. If anything in it is not correct or if any past medical history has been left out, you should tell us. Your policy was issued on the basis that all information in the application is correct and complete. If not, your policy may not be valid.

In September, 1985, Wayne and Betty Stewart applied for a major medical policy and hospitalization policy from Mutual. This time they met with a different agent, Robert Gordon (Gordon). The applications for the policies were identical to the application for the disability insurance policy and Stewart's answers were similar to his prior application.

Stewart received a written notice along with the applications which warned:

[B]e certain to truthfully and completely answer all questions on the application including your medical/health history. FAILURE TO INCLUDE ALL MATERIAL MEDICAL INFORMATION ON AN APPLICATION MAY PROVIDE A BASIS FOR THE COMPANY TO DENY CLAIMS AND TO REFUND YOUR PREMIUM AS THOUGH YOUR POLICY HAS NEVER BEEN IN FORCE. After the application has been completed and before you sign it, reread it carefully to be certain that all information has been properly recorded.

On September 25, 1985, a Mutual employee telephoned the Stewarts and spoke to Betty inquiring about Wayne Stewart's regular physician, last physician and any medication that he was taking. Mrs. Stewart responded that her husband had no regular physician, had a routine physical

with David Suber with no findings, was not on any medication and had seen Dr. Terry Irons in March 1980 for kidney stones.

Mutual sent the Stewarts two "reverification" letters for the two new policies which were signed and returned. Finally, the Stewarts received both policies each containing the corresponding application that was incorporated as part of the policy. Each policy contained a warning that if the information was not correct and complete, the policy might not be valid.

On December 10, 1985, Wayne Stewart was severely injured in an automobile-pedestrian accident. He submitted medical bills under his hospitalization and major medical policies and a claim for disability income benefits under his disability policy. In the course of obtaining medical records for the injuries, Mutual learned of Stewart's "mental health history" with Dr. Suber and Dr. Tursini. Mutual's underwriters determined that had this information been known at the time the applications for insurance were received, the policies would not have been issued.[1]

The Stewarts asked Mutual to reconsider its decision. Following further review, Mutual again determined that rescission was proper.

The Stewarts filed a complaint against Mutual for declaratory judgment and alleged breach of contract, bad faith, breach of fiduciary duty, fraud, consumer fraud, intentional infliction of emotional distress and violation of the insurance code. Mutual answered the complaint and counterclaimed for rescission and recovery of monies already paid out under the policies.

Mutual filed a motion for summary judgment on the contract counts and motions for partial summary judgment concerning the tort claims and punitive damages. The trial court granted the contract motion for summary judgment. The parties agreed

that this was dispositive of the entire case because the remaining claims depended upon the existence of a valid contract.

The Stewarts filed a notice of appeal to this court.[2]

## LEGAL OR ACTUAL FRAUD

We first review the distinction between legal and actual fraud.

A.R.S. § 20–1109 provides:

All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the policy unless:

1. Fraudulent.

2. Material either to the acceptance of the risk, or to the hazard assumed by the insurer.

3. The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

The Stewarts contend that in order to rescind a policy under A.R.S. § 20–1109, an insurer must demonstrate that its insured intended to deceive the insurance company, i.e., to prove actual fraud. This interpretation is contrary to a substantial body of case law.

 If a question on an insurance application seeks facts which are presumably within the personal knowledge of the insured and are such that the insurer would

---

1. Although Mutual rescinded Stewart's major medical, hospitalization and disability insurance, it did not attempt to rescind the United of Omaha life insurance policy or a cancer policy which Stewart had also purchased.

2. The Stewarts do not raise any factual disputes concerning the materiality of the alleged mis-

representations to Mutual's acceptance of the risk nor whether Mutual determined in good faith that it would not have issued the policy had it known the true facts. They argue only that their policy applications were not fraudulent.

naturally have contemplated that the answer represented the actual facts and the answer is false, the insured has committed legal fraud and rescission is allowed. *Illinois Bankers' Life Ass'n v. Theodore*, 44 Ariz. 160, 170–71, 34 P.2d 423, 427 (1934). Where the response is merely an expression of opinion, the insurer must prove actual fraud to rescind a policy under the statute. *Id. See also Smith v. Republic National Life Ins. Co.*, 107 Ariz. 112, 115 n. 1, 483 P.2d 527, 530 n. 1 (1971); *Equitable Life Assur. Soc. v. Anderson*, 151 Ariz. 355, 357, 727 P.2d 1066, 1068 (App. 1986).

Nevertheless, appellants contend that A.R.S. § 20–1109 was enacted to depart from prior case law and that cases which hold that A.R.S. § 20–1109 merely codifies previous Arizona decisional law are incorrect and should be overruled.

■ This court is bound by decisions of the Arizona Supreme Court and has no authority to overrule or disregard them. *Bade v. Arizona Dept. of Transp.*, 150 Ariz. 203, 205, 722 P.2d 371, 373 (App. 1986). The Arizona Supreme Court has held that A.R.S. § 20–1109 codifies prior Arizona decisions and that proof of legal fraud may be sufficient to avoid an insurance policy. *Smith v. Republic National Life Ins. Co.*, 107 Ariz. at 115, 483 P.2d at 530.

## THE WRITTEN APPLICATIONS

Mutual's motion for summary judgment was based specifically on Stewart's alleged misrepresentations in answering the particular questions on the application forms as previously set forth herein. Mutual argued that Stewart had failed to disclose his mental health problems and had failed to disclose that he was taking Elavil, an antidepressant.

First, we consider whether the questions on the application elicit factual answers or opinion. Whether a question elicits facts or opinion may depend upon the evidence in the particular case. *See Equitable Life*, 151 Ariz. at 357–58, 727 P.2d at 1068–69.

■ Questions 13(3) and 14(1) ask whether the applicant had or had been advised that he had or received advice or treatment for a mental or physical *disorder*. It is clear from Stewart's deposition testimony that he believed that he did not have an undisclosed disorder. He acknowledged that he was having problems dealing with stress but indicated that he did not regard himself as suffering a mental disorder nor had he been informed by his physician that he had a mental disorder.

There is nothing in the record before us indicating that any doctor expressly told Stewart that he had a mental disorder. Dr. Suber's affidavit states that he did not prescribe Elavil for depression but for "post-concussion symptoms." Dr. Tursini never disclosed to Stewart his diagnosis of cyclothymic disorder and mixed personality disorder.

Taken in a light most favorable to Stewart, his testimony was that at the time he went to Dr. Suber he had concern that his problems dealing with stress might relate to his 1967 head injury. He concluded that Dr. Suber's examination showed no physical or neurological problems and that he was not suffering from ill health. He regarded his sessions with Dr. Tursini as "talking" rather than "treatment" for a mental disorder. This could reasonably account for his negative responses to questions 13(3), 14(1) and 14(2).

Stewart's deposition testimony was:

Q. Why did you go see Doctor Zuber? [sic]

A. Doctor Zuber [sic]—I just went to talk to him. That's all I did. I was making sure there was nothing that was bothering me from back in the accident in 1967. That's what it was, basically.

\* \* \* \* \* \*

Doctor Zuber [sic] didn't do anything other than say, "You are fine. Maybe you would like to talk to somebody." And that's when he told me to see Doctor Tursini. I saw doctor Tursini on a very casual basis.

Q. Do you consider your visits to him for symptoms of ill health?

A. Not really.

Stewart testified that he informed both Johnson and Gordon of the circumstances of his visits to Dr. Suber and Dr. Tursini and that they advised him that all this information was not necessary in order to respond to the questions on the application. Stewart testified in part,

> We also—I talked with Johnson and Gordon about the stress, like I said, and, you know, all my doctors, and I told them everything, but what I can't understand is you telling me that—that this stuff wasn't—wasn't put on my application. I have no idea why it wasn't because I told them everything.
>
> Q. Who is "them?"
>
> A. Pete Johnson and Bob Gordon. I told them everything about my doctors, about my stress, about my wife's ear surgery.
>
> . . . .
>
> There was no big deal about it. I don't know why anybody is making a big deal about it. It wasn't. It is a very stressful society.
>
> Q. You never told Pete Johnson that you had a mixed personality disorder, did you?
>
> . . . .
>
> A. The only time I ever heard of such a thing is when this letter that I mentioned came. I didn't even know of such a thing even existed. Is this sort of like that likes the city sometimes and the mountains other times? Is that what this means?
>
> Q. Just to make sure we understand each other, you never told Pete Johnson that you had a mixed personality disorder?
>
> A. I don't believe I ever had one.
>
> . . . .
>
> A. I told them everything that they wanted to know. They asked me who did I see and I told them.
>
> . . . .
>
> I don't see doctors as a general rule. I am not a doctor-type person that goes to doctors a lot. But the list was whatever I told them, everything I told them. I told them everything. In fact, Pete, if anything, didn't say too much. He just wrote down whatever he wanted, I guess. Gordon actually made comments like "You don't need all that stuff," but Pete never said anything.

■ We conclude that the answers to questions 13(3), 14(1) and 14(2) elicited responses that are mixed facts and opinions. Stewart's understanding of "mental disorder" and "ill health" may well differ from what Mutual understood those terms to mean. We explore this issue further to determine whether Stewart's interpretations were those of a reasonable person under the circumstances.

Mutual did not define, in its application forms, the medical terms used on those forms. Stewart argues that a number of the critical terms are ambiguous. In examining this issue, we are guided by the following language from the Arizona Supreme Court:

> Where the language employed is unclear and can be reasonably construed in more than one sense, an ambiguity is said to exist and such ambiguity will be construed against the insurer. In determining whether an ambiguity exists in a policy, the language should be examined from the viewpoint of one not trained in law or in the insurance business.

*Sparks v. Republic National Life Ins. Co.,* 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982).

We might also add that it seems reasonable to us that the medical portion of the application should be examined from the viewpoint of one not trained in medicine.

On the application form, Stewart was asked if he had been advised *by a physician* that he had a mental or nervous disorder, and whether, within the past five years he had any mental or physical disorder not previously listed, or if he had, been told he had, advised or treated for any symptom of ill health. To all these questions, he answered no.

Stewart had seen Dr. Suber, a medical doctor. Dr. Suber referred Stewart to Dr. Tursini, a clinical psychologist. Under Arizona law, the term "physician" is limited to medical doctors and doctors of osteopathy.

A.R.S. § 36–501(19). By statutory definition, Dr. Tursini would not be deemed a physician.

To further illustrate the problems of ambiguity in the policy applications, we focus upon other key terms. Much discussion has centered upon whether Stewart failed to disclose a "mental disorder", a term not defined in the applications. Statutorily, "mental disorder" is defined as "... a *substantial* disorder of the person's emotional processes, thought, cognition or memory." A.R.S. § 36–501(22). (Emphasis supplied.) The Georgia Court of Appeals has determined that "mild depression and a great deal of anxiety" could not be characterized as a mental or nervous disorder. *ITT Baking Co. v. Comes*, 165 Ga.App. 598, 302 S.E.2d 137, 138–39 (1983). We agree. Not every symptom of stress, emotional instability or differing personality trait rises to the level of a mental or personality disorder.

Mutual argues that Dr. Suber "diagnosed recent symptoms of anxiety and mood depression, possibly symptomatic of mild depression...." They further point to Dr. Tursini's diagnosis of a cyclothymic disorder, which they urge, is defined in a respected definitional source as "a disposition marked by alterations of mood between elation and depression out of proportion to apparent external events and rather stimulated by internal factors; it may be hypomanic, depressed, or alternating." Blakiston's *Gould Medical Dictionary*, 348 (4th ed. 1979).

We find these arguments unpersuasive. What was asked and therefore what is relevant is what Stewart was told and his opinion of his mental and physical health. Stewart was told his test results were normal and that he was "fine." No one told him he had a mental disorder or that he was receiving treatment for such.

Nothing in the record suggests that Stewart was familiar with definitions contained in the medical dictionary cited by Mutual. We assume that any definitions embraced by Stewart would most likely be compatible with those contained in sources more readily available to the average person. *Webster's Ninth New Collegiate Dictionary* 742 (1983) defines "mentally disordered" as "MAD, CRAZY b: intended for the care or treatment of persons affected by psychiatric disorders." From Stewart's deposition testimony, it is obvious that in his opinion his condition did not fit this definition.

We observe in passing that it is difficult to imagine a situation wherein a layman's assessment of his mental health is other than an opinion. He might testify as a fact that he was told certain things by his doctor, but his own evaluation would most certainly be stated as an opinion, not as a fact. Even an expert's conclusion is generally couched in terms of being an opinion.

From the record before us and the definitions cited above, we see no reason why Stewart should have answered questions relating to his mental health other than as he did.

We likewise find the term "symptoms of ill health" to be ambiguous. What constitutes a "symptom" or at what point a particular individual might characterize his body's afflictions as amounting to "ill health" is highly subjective, may speak more of a person's attitude than of his physical health, and is often more akin to an opinion than to fact.[3] Again, from the record before us, we do not find Stewart's answers to be unreasonable or fraudulent.

Stewart checked "yes" to question 14(3) which asks whether the insured has had any physical examinations. He identified his examination by Dr. Suber. Under "date and reason last consulted," the expla-

---

**3.** The following anecdote illustrates the point. Shortly before his death, John Quincy Adams was greeted by a friend with the question, "Mr. Adams, how are you?" The elderly former president replied, "John Quincy Adams himself is quite well, thank you, sir, quite well indeed. But the house in which he is living is becoming quite dilapidated and is tottering on its founda-
tions. Time and the seasons have almost destroyed it. The roof is warped and worn out, the walls are so shattered that they tremble in every wind. The old tenement is becoming almost uninhabitable and I think I shall have to move out of it quite soon. But John Quincy Adams himself is quite well, thank you, sir, quite well indeed."

nation is "physical-work related." Stewart denied that he directed either agent to write that the purpose of the visit was a routine physical required by an employer. However, he also testified that he didn't necessarily disagree with the characterization that it was a physical in connection with his work. He stated:

Q. Do you know of any employment that may have required a physical?

A. See, someone wrote here 'Wayne, general physical for work, May of 1984.' I have no idea who wrote that. I didn't write it but that is written on the thing....

Q. ... I am wondering if there is anyplace you worked that may have required a physical?

A. My own work. Somebody wrote 'physical for work' and that's fine with me. I don't know what it is. Whoever wrote it—You ask the man who wrote it.

There are factual disputes concerning what Stewart told Johnson and Gordon about his examination by Dr. Suber. As discussed below, whether the explanation of Stewart's answer to question 14(3) was a statement of fact by Stewart or an agent's description is unclear. Whether it was reasonable for Stewart to believe that "physical-work related" was a correct response is also a mixed issue of fact and law.

Finally, with respect to question 16, we note that there is no evidence in the record before us that Stewart was taking medication at the time he completed the applications. There is undisputed evidence that he was prescribed Elavil. We find nothing in the record to indicate whether Stewart informed either insurance agent of this prescription nor do we find that he was asked this specific question. However, we note that Mutual's motion for summary judgment was not based on whether Stewart failed to inform Mutual that he had been prescribed medication, i.e., that he falsely answered question 17 by leaving blank the space under the heading "What treatment was given or medication prescribed." The motion was based on question 16 which asks whether Stewart was *taking* medication at the time.

## VERBAL COMMUNICATIONS TO AGENTS

For purposes of this appeal we assume that the Stewarts' version of what the Stewarts disclosed to Mutual's agents, Johnson and Gordon is true. We therefore are assuming that Stewart told Johnson and Gordon that he went to Dr. Suber for stress and that Dr. Suber referred him to Dr. Tursini. We also assume that Stewart did not know Dr. Tursini's diagnosis.

The Stewarts argue that knowledge of the agents must be imputed to the insurance company and should estop Mutual from voiding the policies based on misrepresentations on the written applications. They allege that an applicant for insurance is not required to re-examine the written application to determine which information the agent deemed pertinent. In support of these arguments, the Stewarts rely on *Smith v. Republic National Life Ins. Co.*, 107 Ariz. at 115 n. 1, 483 P.2d at 530 n. 1 and a dissenting opinion in *Marine v. Allstate Ins. Co.*, 12 Ariz.App. 229, 232, 469 P.2d 121, 124 (1970).

Mutual contends that this case is directly controlled by the majority opinion in *Marine*. There, an applicant for disability insurance failed to disclose that he had multiple sclerosis and signed the application representing that the "answers are complete and true." When Allstate learned of the multiple sclerosis, it rescinded the policy pursuant to A.R.S. § 20–1109. The insured contended that he did not know he had multiple sclerosis at the time of the application and further argued that he told the agent he had "diffuse sclerosis," but the agent failed to record it on the application.

This court rejected the insured's arguments, explaining that even if the agent incorrectly filled out the application, the insured had a chance to review and correct any misstatements. The *Marine* opinion relies upon a rule set forth in *Greber v. Equitable Life Assur. Soc.*, 43 Ariz. 1, 28 P.2d 817 (1934), which holds that an insured is bound by misstatements appearing in an application attached to the policy de-

livered to and retained by him. The rationale for the rule expressed in *Greber* is that the insured has had an opportunity of examination and is under a duty to read over the application attached to the policy and correct any errors. *See generally* 12A Appleman, *Insurance Law and Practice*, § 7307 at 448–53 (1981).

The dissenting opinion in *Marine* distinguished *Greber* on grounds that the misinformation in *Greber* had been furnished by the applicant. In *Marine*, the applicant gave the correct information to the agent who did not fill it in. The dissenting opinion argued that the knowledge of the agent should be imputed to the insurance company.

In *Smith v. Republic National Life Ins. Co.*, the Arizona Supreme Court created an exception to the general rule set forth in *Greber*. In *Smith*, the trial court had found that an insurance agent had fraudulently entered false answers to some of the questions on the application, without the fault, knowledge or collusion of the plaintiff and had induced the plaintiff to sign the application without reading either the application or the certification by his name. However, the trial court granted rescission to the insurer because it interpreted A.R.S. § 20–1109 to require that an insurer had to satisfy only one, not all, three subsections of the statute. Therefore, it found in favor of the insurer based on its proof that the misrepresentation was material to accepting the risk and that it would not have issued a policy had the true facts been made known.

The Arizona Supreme Court reversed the holding of the trial court, finding that all three subparagraphs in A.R.S. § 20–1109 must be satisfied to establish a basis for rescission. Because the trial court had already found that there was no legal or actual fraud by plaintiff, the supreme court reversed. In reversing, the court held that the plaintiffs' failure to read the application form after the policy was issued did not defeat his right to recover under the circumstances of the case.

*Smith* held that *under its facts* the agents' knowledge was imputed to the insurance company. Those facts included completion of an application form by an agent engaged in actual fraud, the agent's inducing the applicant not to review the application, factually correct responses to the questions by the applicant and no independent contact between other agents of the insurer and the applicant for purposes of verification.

In reaching its decision, the Arizona Supreme Court stated:

> First of all, we are of the opinion that the rules set forth in *Greber v. Equitable Life Assurance Society, supra,* relied on by the trial court, does not apply to the circumstances of this case. In the *Greber* case, there could be no finding of knowledge imputed to the insurance company as the incorrect information was furnished by the applicant rather than the agent. In the instant case, however, the trial court found that plaintiff Smith answered the questions asked of him fully and completely and without any intent to defraud. That knowledge of the agent is in law the knowledge of the defendant insurance company, whether or not communicated to it by its agent.

107 Ariz. at 117, 483 P.2d at 532.

As pointed out by Mutual, the *Smith* decision does not expressly overrule *Marine.* Further, the facts of this case fall somewhere in between the facts in *Marine* and *Smith.* The information was filled in by the agents of the insurance company, but there is no indication that those agents attempted to prevent Stewart from reading the application. Additionally, Stewart had numerous opportunities after the application was completed to review it for error. However, Stewart testified that both Johnson and Gordon told him that it was not necessary to include all the information he was telling them on the written applications. He also stated that he relied on them to put down the necessary information.

An insured is under a duty to examine answers to determine if they are accurate and complete. *Greber*, 43 Ariz. at 12, 28 P.2d 817. *See also Marionjoy Rehabilitation Hospital v. Lo*, 180 Ill.App.3d

**108**

49, 129 Ill.Dec. 296, 535 N.E.2d 1061 (1989); *Friedman v. Prudential Life Ins. Co. of America*, 589 F.Supp. 1017 (S.D.N.Y.1984). However, the insurer cannot rely on incorrectly recorded answers known to the insured where the incorrect answers are entered pursuant to the agent's advice, suggestion or interpretation. *Logan v. Allstate Life Ins. Co.*, 19 Ill.App.3d 656, 312 N.E.2d 416 (1974).

In connection with a discussion of misrepresentation as the basis for voiding a policy, one commentator has stated:

> The intent of the law is to permit one who, in good faith has done honestly all he is led by the insurer's agent to believe he is required to do.... And in order for a company to defeat a claim for loss, it must show that representations in the application were those of the insured, and not mistakes of its own.

12A Appleman, *supra* at 442.

We conclude that under the circumstances of this case, summary judgment in favor of Mutual was improvidently granted. First, it is not clear whether the questions on the application, which were relied on in the motion for summary judgment, elicited factual responses or opinions. If they elicit opinions, Mutual would have to show actual fraud. *Illinois Bankers' Life*, 44 Ariz. at 170–71, 34 P.2d at 427. Second, if Stewart gave truthful responses and full disclosure to the agents which they did not include on the application and the answers do not appear false to a reasonable person in the position of the insured reviewing the application, we know of no authority that suggests the answers should be deemed to be fraudulent and therefore conclude that Mutual may be estopped from alleging that they are fraudulent.

■ The Stewarts also argue that Mutual should be estopped from rescinding the policies because it failed to conduct a thorough underwriting investigation. This argument was not raised below and we will not consider it for the first time on appeal. *Campbell v. Warren*, 151 Ariz. 207, 208, 726 P.2d 623, 624 (App.1986).

We reverse summary judgment granting rescission to Mutual.

### CROSS–ISSUES

Mutual raised cross-issues concerning its entitlement to partial summary judgment on Stewart's tort claims in the event that we reversed summary judgment on the contract claim.

■ The trial court did not rule on the merits of these issues. It denied the motions because the parties agreed that a defense judgment on the contract claim would extinguish the related tort claims. We find that it would be inappropriate to address these issues when the trial court has not considered them in the first instance. Further, an order denying summary judgment is neither appealable nor subject to review on an appeal from final judgment. *Fleitz v. Van Westrienen*, 114 Ariz. 246, 248–49, 560 P.2d 430, 432–33 (App.1977).

We reverse the judgment and remand for further proceedings in accordance with this opinion.

BROOKS, P.J., and LANKFORD, J., concur.