953 P.2d 911

**David C. McCANDLESS and Debra McCandless, husband and wife, Appellees,**

v.

**UNITED SOUTHERN ASSURANCE COMPANY, Appellant.**

Nos. 1 CA–CV 96–0025, 1 CA–CV 96–0517.

Court of Appeals of Arizona, Division 1, Department C.

April 3, 1997.

Review Denied April 21, 1998.

Hofmann, Salcito & Stevens by Leroy W. Hofmann and Jennings & Haug by Jack R. Cunningham, Paul S. Ruderman, Phoenix, for Appellees.

Bess & Dysart, P.C. by Matthew D. Kleifield, Donald J. Sapala, Phoenix, for Appellant.

## OPINION

SULT, Judge.

This consolidated appeal arises from two separate but related garnishment judgments entered for appellees David and Debra McCandless, as judgment-creditors, against appellant United Southern Assurance Company ("USAC"), as garnishee-defendant. In both proceedings, the trial court entered summary judgment, determining that USAC owed its policy limits towards satisfaction of underlying judgments McCandless had obtained against persons or entities purportedly insured by USAC.

## BACKGROUND

The facts of this case are not disputed. In 1989, TWS Farms, Inc., a company based in Florida, applied to USAC for a policy of vehicle insurance covering its large tractor trucks used for commercial purposes. The application submitted by TWS listed three specific tractors and indicated that these were the only such items of equipment being operated under TWS' authority. TWS also agreed in the application that the policy would be void from inception if the information in the application was found to be materially false or misleading.

On May 24, 1989, USAC issued its Commercial Lines Policy to TWS, providing liability coverage up to $750,000 for any one accident for covered vehicles, which included tractor-trailer combinations. The policy listed only the three tractors specifically identified in the application, and provided coverage for only those tractors, together with any three non-owned trailers. Coverage extend-

ed to anyone using a covered vehicle with TWS' permission.

After securing coverage, TWS obtained permission from the Arizona Department of Transportation to operate in the state of Arizona. This process included a showing by TWS of financial responsibility, as required by Arizona Revised Statutes Annotated ("A.R.S.") section 28–1232(A), for those wishing to operate vehicles with a gross weight in excess of twenty thousand pounds. To comply with this requirement, TWS certified the USAC policy to the Arizona authorities as proof of financial responsibility.

On July 15, 1989, McCandless was seriously injured when the vehicle he was driving collided with a tractor-trailer combination owned by TWS and driven by its employee, James B. Clegg. The accident occurred in Arizona but the tractor involved in the accident was not one of the three listed in the USAC policy. Within three months after the accident, USAC discovered that TWS was operating over one hundred tractors instead of merely the three listed in the policy. Upon learning this, USAC immediately notified TWS that the policy was being canceled due to misrepresentations made in the application.

McCandless ultimately filed suit against Clegg and TWS for damages arising out of the accident, and served the complaint on both defendants. McCandless gave USAC notice of its filing of the complaint but neither of the defendants notified USAC nor asked it to provide a defense. USAC did not defend the action.

Clegg and TWS failed to answer or appear in the action and default was entered against both. McCandless applied for a hearing to have damages determined, but was able to proceed only as to Clegg, since TWS had instituted bankruptcy proceedings. After the trial court conducted a hearing on damages, it entered a default judgment against Clegg on September 8, 1994 in the amount of $2,700,000.

McCandless thereafter applied for a writ of garnishment against USAC, alleging that the USAC policy provided coverage for the underlying Clegg judgment. USAC contested the issue but the trial court entered summary judgment for McCandless, finding as a matter of law that USAC was liable in the amount of $750,000, its policy limits. As part of this garnishment judgment, the trial court also ordered USAC to pay interest on the underlying Clegg judgment of $2,700,000, overruling an objection by USAC that it should be required to pay interest only on $750,000. USAC timely appealed from this first garnishment judgment.

While the first garnishment was still pending, the bankruptcy proceedings involving TWS had either concluded or the stay had been lifted. Consequently, McCandless moved for summary judgment on its claim against TWS, arguing that pursuant to the doctrine of respondeat superior, TWS was liable for the judgment against Clegg. The trial court agreed, and on September 15, 1995, it entered judgment for McCandless against TWS for the same $2,700,000. The trial court also assessed interest on this TWS judgment accruing from September 8, 1994, the date of entry of the Clegg judgment.

McCandless then filed a second writ of garnishment against USAC, alleging the USAC policy also covered the TWS judgment. This issue was again contested and the trial court granted summary judgment for McCandless, finding that USAC owed its $750,000 policy limits toward the underlying TWS judgment.[1] Over objection, the trial court again ordered that USAC pay interest on $2,700,000, rather than on $750,000. It also ordered that interest against USAC was to be calculated from September 8, 1994, the date of entry of judgment in the underlying Clegg action, rather than September 15, 1995, the date of entry of judgment in the underlying TWS action. USAC timely appealed from this second garnishment judg-

---

1. The judgment clarified that there was but one amount owed by USAC under the two garnishment judgments, that the amount could be collected only once, and any amount collected un-der one garnishment judgment would be credited to the amount owed under the other garnishment judgment. This portion of the judgment is not contested on appeal.

ment and both appeals have been consolidated for decision.[2]

## ISSUES

As to both garnishment judgments, USAC attacks the finding of coverage as well as the ruling that it owes judgment interest on $2,700,000, rather than on $750,000, the amount of the respective judgments against it. Regarding the second garnishment judgment, USAC also argues that to whatever extent it may owe interest, the interest should be computed from September 15, 1995, the date of the underlying TWS judgment, not from September 8, 1994, the date of the underlying Clegg judgment.

## DISCUSSION

### I. The Coverage Question

This issue was decided by the trial court as a matter of law. The trial court found that, under relevant provisions of the Uniform Motor Vehicle Safety Responsibility Act ("the Act"), A.R.S. sections 28–1101 to 28–1262, USAC is required to provide its policy limits to partially satisfy the underlying Clegg and TWS judgments. The same issue is presented to us and is one of statutory interpretation. Such questions are legal issues and we therefore review the trial court's ruling *de novo*. *Hawkins v. Department of Economic Sec.*, 183 Ariz. 100, 103, 900 P.2d 1236, 1239 (App.1995). USAC makes three arguments, each of which requires that we interpret some provision of the Act.[3]

### A. Scheduled Vehicle Limitation

■ USAC's first argument is based on the policy provision that expressly limits coverage to the TWS vehicles listed in the policy. Since the tractor driven by Clegg was not one of those listed vehicles, USAC con-

tends coverage is precluded as a matter of law. McCandless responds that notwithstanding this provision, certain sections of the Act operate to impose coverage. The resolution of this dispute requires a review of the specific provisions of the Act which govern insurance policies issued in Arizona covering the operation of large tractor-trailer combinations.

Arizona, like most other states, has imposed certain requirements upon all motorists using the state's roads as a means of providing some degree of financial protection for potential accident victims. These requirements are set forth within the eight numbered articles comprising the Act. Together, the eight articles are grouped in Chapter 7 of Title 28 of the Arizona Revised Statutes.

■ Article 7 of the Act is entitled "Motor Carrier Financial Responsibility," and it is specifically directed to persons operating particular types of large vehicles for commercial purposes. A.R.S. §§ 28–1231 to 28–1238. Section 28–1232(A) requires that every person who commercially operates a vehicle or vehicle combination in excess of twenty thousand pounds gross weight must comply with the financial responsibility provisions of Article 7. If the vehicle combination exceeds twenty-six thousand pounds, section 28–1233(A)(1)(a) requires a policy of liability insurance in the minimum amount of $750,000.[4] Finally, section 28–1234 provides in relevant part:

> A. [A] person who operates motor vehicles in this state and is subject to the financial responsibility requirements of this article shall maintain at all times the amounts prescribed in § 28–1233 which obligates the person to pay compensation for injuries to persons and for loss or damage to property by reason of the ownership,

---

2. Throughout this opinion, each of the judgments McCandless obtained against Clegg and TWS is referred to as the "underlying judgment" or, where necessary, additionally identified by reference to Clegg or TWS. The resulting garnishment judgments McCandless obtained against USAC are referred to as either the "first" (based on the underlying Clegg judgment) or "second" (based on the underlying TWS judgment) garnishment judgment.

3. Throughout this opinion, the sections of the Act that we construe are the versions that were in effect in 1989, the year the subject policy was issued and the accident occurred.

4. It is undisputed that the vehicle involved in this accident was a commercial vehicle in the weight category requiring coverage of $750,000 if operated in Arizona.

maintenance or use of *any* motor vehicle or vehicle combination owned or operated by the person.

B. [T]he [agency] may require every person who is subject to the financial responsibility requirements of this article to certify the existence of financial responsibility in the form and at the times as the [agency] deems necessary. The [agency] may forward the certification to the named insurer to determine if the certification is correct. . . .

(Emphasis added.)

The foregoing provisions are the ones pertinent to our "scheduled vehicle" issue and the ones we must construe to resolve that issue. Our goal is not only to ascertain the legislative intent behind these provisions but also to give effect to that intent. *State v. Korzep,* 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). As for the first step in this interpretive process, it is not difficult to ascertain what the legislature intended; namely, that a source of compensation is to be made available to those using the streets and highways of this state who are injured by reason of the ownership, maintenance or use of *any* large vehicle, such as tractor-trailer combinations. *See Midland Risk Management Co. v. Watford,* 179 Ariz. 168, 171–72, 876 P.2d 1203, 1206–07 (App.1994) (The primary purpose of the Act "is the protection of the travelling public from financial hardship resulting from the operation of motor vehicles by financially irresponsible persons.").

We also discern that the legislature intended that the existence of appropriate insurance not be left to chance or the vicissitudes of individual economic circumstances. Consequently, the legislature also established a certification process by which the Arizona authorities could be certain that appropriate insurance coverage existed before granting permission to operate in this state. This is accomplished by section 28–1234(B), whereby the legislature empowered the Arizona Department of Transportation, the agency responsible for administering the legislative plan, to require that each person wishing to own, maintain or operate such vehicles in Arizona certify to the agency that appropriate insurance coverage existed. To further insure that the prospective user in fact has appropriate coverage, the agency was additionally authorized to require the insurance company to confirm the existence of coverage.

■ Guided by this framework of legislative intent, the second question in the interpretive process is how we give effect to that intent. McCandless asserts that pursuant to the statutory scheme, when a policy is certified to the agency and coverage is confirmed by the insurance company, and as a result thereof permission is obtained to operate in Arizona, that policy is deemed amended to cover any large vehicle owned or operated by the insured or its authorized agent. Thus, a "scheduled vehicle" limitation in the policy cannot defeat coverage.

We agree with McCandless. The legislative purpose underlying the Act, including Article 7, is to provide a source of compensation for injured motorists. The only way to give effect to that purpose is to hold that when a policy is certified to the agency pursuant to section 28–1234(B), and permission to operate in Arizona is thereby obtained, the policy is deemed amended by operation of section 28–1234(A) to cover *any* vehicle which is owned or operated in Arizona by the insured and which meets the weight criterion of section 28–1232(A). *See Principal Casualty Ins. Co. v. Progressive Casualty Ins. Co.,* 172 Ariz. 545, 547, 838 P.2d 1306, 1308 (App.1992) (in holding that the provision of the Act that liability insurance shall insure named insured and permissive users is read by law into every policy in Arizona, the court stated: "People should not be injured by the operation of motor vehicles and be left uncompensated because of the particular working of the policy insuring the car that caused the injury, thus making the injured parties public charges.").

In the case before us, the USAC policy was certified to Arizona authorities and USAC confirmed the existence of appropriate coverage to those authorities, all pursuant to section 28–1234(B). As a consequence, TWS received permission to operate in Arizona. Under these circumstances, we hold that the USAC policy was amended by operation of section 28–1234(A) to insure any

large vehicle owned or operated by TWS in Arizona.

The equity of this result is made apparent when we examine the certification process in this case. It is clear that USAC contemplated that the policy, as written, might not comply with the laws of a state where the policy was sought to be certified. To obviate this problem for its insured, USAC inserted an endorsement in the policy, providing in pertinent part:

The certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction with respect thereto, *amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby* . . . .

(Emphasis added.)

In addition, USAC filed Form E with the agency. This form is required by the agency pursuant to its authority in 28–1234(B) to confirm with the insurer the existence of appropriate coverage. This form provides in relevant part:

A policy or policies of insurance . . . *has or have been amended to provide automobile bodily injury and property damage liability insurance covering the obligations imposed upon such motor carrier by the provisions of the motor carrier law of the State* . . . .

(Emphasis added.)

The plain language of both the endorsement and Form E acknowledges and agrees that the policy when certified will be deemed amended to bring it into compliance with all applicable laws concerning "the extent of the coverage and limits of liability required thereby." This necessarily included compliance with section 28–1234(A) requiring coverage for *any* large vehicle operated by TWS. By including the endorsement and executing

Form E, USAC enabled TWS to certify the policy and obtain permission to operate in Arizona. USAC cannot now be heard to assert that it meant something other than what it said in the endorsement or that it should not be held to the consequences of its filing of Form E.

USAC nevertheless does attempt to avoid the impact of the endorsement and Form. While it does not dispute the import of the language in these provisions, it counters that the mere filing of a Form E cannot operate to waive a scheduled vehicle limitation in a certified policy absent a statute specifically mandating such a waiver. USAC cites no authority directly supporting this proposition, but refers to cases where the state had such a statute and the court consequently found coverage for a non-scheduled vehicle. *See, e.g., Hindel v. State Farm Mut. Auto. Ins. Co.,* 97 F.2d 777, 783 (7th Cir.1938) (the policy contained an endorsement required by Indiana law whereby the insurer waived the policy description of vehicles operated or used by the insured).

USAC's argument ignores that Arizona does have a statute which effectively waives a scheduled vehicle limitation in a certified policy. Section 28–1234(A) requires coverage for any large vehicle "operated" by the insured, not any large vehicle that may be scheduled in the certified policy. We see no way to read this provision other than to mean that if the insured is *operating* a large vehicle, it is *covered* by the certified policy. And if it is covered by the certified policy, it logically follows that a scheduled vehicle limitation that exists in the certified policy must give way to the requirement of the statute. We find no merit to USAC's argument.

We hold that when the USAC policy was certified to Arizona authorities and as a result thereof TWS received authorization to operate in Arizona, the provision limiting coverage to scheduled vehicles was amended out of the policy. We affirm the trial court on this issue.[5]

---

**5.** We clarify that this holding does not amend out of the policy any right of recourse the policy may give the insurer against the insured.

## B. Cancellation for Fraud

■ USAC's second argument is that it should be absolved from coverage because the policy was void at its inception due to the fraud perpetrated by TWS in procuring the policy. We assume for purposes of this analysis that such fraud occurred when TWS represented in its application that it operated only three vehicles but was operating over one hundred such vehicles a mere six months later. McCandless responds that section 28–1170(F)(1) is applicable and precludes USAC from canceling the policy in this case.[6]

Section 28–1170(F)(1) provides:

F. Every motor vehicle liability policy is subject to the following provisions which need not be contained in the policy:

1. The liability of the insurance carrier with respect to the insurance required by this chapter shall become absolute when injury or damage covered by the motor vehicle liability policy occurs. The policy may not be canceled or annulled as to such liability by an agreement between the insurance carrier and the insured after the occurrence of the injury or damage, and no statement made by the insured or on his behalf and no violation of the policy shall defeat or void the policy.

In *Midland Risk,* Division Two of this court held that this section prevents an insurer under an ordinary automobile policy from canceling coverage required by the Act even where there has been fraud in the application. 179 Ariz. at 171, 876 P.2d at 1206. It found that because of the important public policy behind the Act, this section took precedence over another general insurance provision, section 20–1109, which allows insurance policies to be canceled for fraud. *Id.*

USAC notes, however, that section 28–1170(F)(1) is part of Article 4 of the Act. USAC argues that owners and operators of large motor carriers are subject solely to the requirements of Article 7 of the Act, and the provisions in the other articles do not apply to policies issued pursuant to Article 7. Con-

sequently, USAC reasons, since Article 7 has no provision like section 28–1170(F)(1), USAC should not be precluded from asserting and proving that the policy became void *ab initio* for fraud.

USAC relies for this argument on the case of *Wilshire Ins. Co. v. Home Ins. Co.,* 179 Ariz. 602, 880 P.2d 1148 (App.1994). There, Division Two of this court considered whether the permissive user coverage mandated by section 28–1170(B)(2), which also is found in Article 4, applied to a policy issued pursuant to Article 7. Reasoning that the legislature intended Article 7 to be self-contained, *Wilshire* held that Article 7 was not subject to the provisions of any other article in the Act. Consequently, notwithstanding the mandate of section 28–1170(B)(2), the provision in the subject policy which excluded permissive user coverage was found valid. *Id.* at 606, 880 P.2d at 1152.

We acknowledge that if *Wilshire* applies, it would dictate a result favorable to USAC. However, we find *Wilshire* distinguishable on its facts and also question its rationale. We address the former first.

As previously noted, all eight articles comprising the Act are found in Chapter 7 of Title 28. Section 28–1170(F)(1) specifically makes its non-cancellation rule applicable to every policy *"required by this chapter. ...."* (Emphasis added.) Article 7 is a part of Chapter 7 and the policy at issue here is therefore required by Chapter 7.

The use of the word "chapter" in section 28–1170(F)(1) is a significant factor which distinguishes our case from *Wilshire.* The *Wilshire* court was construing section 28–1170(B)(2), and nowhere in that section is there any mention that its provisions are to be applied to policies issued pursuant to the entire chapter. For that reason, the *Wilshire* court was free to explore and determine whether the legislature intended Article 7 policies to be subject to the provisions of section 28–1170(B)(2).

---

6. McCandless also asserts that USAC cannot argue cancellation for fraud because of its failure to prove it returned premiums to TWS. However, this argument was not raised in the trial court and we will not consider it for the first time on appeal. *Stewart v. Mutual of Omaha Ins. Co.,* 169 Ariz. 99, 108, 817 P.2d 44, 53 (App.1991).

Unlike the *Wilshire* court, we do not have that freedom. Rather, we are constrained by the legislature's own language expressing its intent that all policies required by Chapter 7 are subject to the non-cancellation rule of section 28–1170(F)(1). As we have noted in another context:

> The words "title," "chapter," "article," and "section" are used throughout the codification of Arizona statutory law and each has a consistent usage and meaning. If there is ever a situation where we are compelled to follow the maxim that "[t]he plain meaning of a statute must be observed," it is when the legislature expresses itself using its own technical terms.

*State ex rel. Fox v. New Phoenix Auto Auction,* 185 Ariz. 302, 308, 916 P.2d 492, 498 (App.1996) (citations omitted).

By holding that the term "chapter" in section 28–1170(F)(1) makes the restriction therein applicable to the entirety of Chapter 7, including Article 7, we give effect to the plain meaning of the term. We also avoid rendering the term contradictory vis-a-vis Article 7, a result we eschew whenever we construe legislation. *State v. Deddens,* 112 Ariz. 425, 429, 542 P.2d 1124, 1128 (1975). We therefore find that *Wilshire* is factually distinguishable and does not apply.

USAC nevertheless urges the *Wilshire* result upon us, reasoning, as did the *Wilshire* court, that a provision in Article 8,[7] which exempts Article 7 policies from the purview of Article 8, is solid evidence that the legislature intended Article 7 to be exclusive and self-contained. *Wilshire* concluded, and USAC agrees, that this exemption precluding applicability of Article 8 necessarily precludes applicability of all other articles to Article 7. However, neither the *Wilshire* court nor USAC explains why this should be so.

■ Upon careful consideration, we do not find *Wilshire's* rationale persuasive. We initially note that the first six articles of Chapter 7 were enacted in 1951.[8] Article 7 was added in 1982 and Article 8 one year later.[9]

In analyzing successive legislative enactments, we regularly presume the legislature knows its own laws. *See State v. Garza Rodriguez,* 164 Ariz. 107, 111, 791 P.2d 633, 637 (1990). We have held that if the legislature amends an existing statute, we presume it intended some change in existing law. *Id.* A logical corollary is that if the legislature, in adding to a statutory scheme, does *not* amend an existing statute which would impact on the addition, we must presume the legislature intended the existing statute to impact the addition.

Applying these tenets of construction, we conclude that when the legislature added Article 7 in 1982, it knew of the existence and meaning of the term "chapter" in section 28–1170(F)(1). We further conclude that the legislature deliberately chose not to amend that term to exempt Article 7 policies from its effect. Had the legislature so intended, it would have amended section 28–1170(F)(1) or have included in Article 7 the type of exempting provision that it did include in Article 8. That it did neither is clear evidence that it intended the non-cancellation provision of section 28–1170(F)(1) to apply to all policies covered by Chapter 7, including Article 7 policies.

We decline to follow *Wilshire.* Consequently, we find that the USAC policy became non-cancelable as to McCandless upon the occurrence of the underlying accident. We affirm the trial court on this issue.

## C. Coverage for the Clegg Judgment

■ USAC's third argument is limited to disputing coverage for the Clegg judgment. USAC asserts that it should be relieved from providing any coverage for that judgment, arguing that the financial responsibility requirements apply only to the owner or operator of a motor carrier company seeking to do business in Arizona. USAC points out that section 28–1231(4) defines a "person" subject to the requirements of Article 7 as "an owner or operator of any motor vehicle or vehicle combination." USAC asserts that Clegg was

---

7. A.R.S. § 28–1252(5).

8. 1951 Ariz.Sess. Laws Ch. 122.

9. 1982 Ariz.Sess. Laws Ch. 207, § 2; 1983 Ariz. Sess. Laws Ch. 272, § 2.

neither the owner nor, for financial responsibility purposes, the "operator." USAC reasons that in this context, "operator" can mean only the operator of a business as opposed to the operator of a piece of equipment.

We find that USAC is confusing the requirements of providing insurance coverage with whom the insurance is to cover. While pursuant to section 28–1234(A), it is only the owner or operator of the business who is required to furnish the insurance, this section also clearly provides that the insurance is to cover damages arising out of the "use" of the motor vehicle. No limitation restricting coverage to instances when the use is by the owner or operator of the business can be read into this provision. Clegg's "use" of the vehicle involved in this accident came within the provision of section 28–1234(A) and, therefore, the USAC policy covers the Clegg judgment.

## II. The Interest Question

■ USAC questions whether the trial court erred in its order making USAC liable for interest on the amount of the underlying judgments, rather than on the amount of USAC's policy limits. A subsidiary question is whether such interest is payable from September 15, 1995, the date of the underlying TWS judgment or, as ordered by the trial court, from September 8, 1994, the date of the underlying Clegg judgment.[10]

■ Regarding the principal question, the proper rule of law is that where the policy has no provision for payment of interest on a judgment entered against the insured, interest must be calculated on the policy limits, not the amount of the underlying judgment. *Cochran v. Auto Club Ins. Ass'n,* 169 Mich. App. 199, 425 N.W.2d 765, 767 (1988); C.T. Dreshler, *Annotation,* 76 A.L.R.2d 983, 984 (1961) ("Generally speaking, an insurer in a liability insurance policy is not, in the absence of a provision in the policy to that

effect, liable for any interest on a judgment recovered against the insured."). *See Stufflebeam v. Canadian Indem. Co.,* 157 Ariz. 6, 9–10, 754 P.2d 335, 338–39 (App.1988) (Division Two of this court modified a judgment to provide for interest on the amount of the judgment against insurer, rather than on underlying judgment, stating that it was aware of no authority that would require payment of interest on the entire judgment).

Where the policy in question does have a provision regarding payment of interest on a judgment against the insured, the courts are split as to whether such a provision extends to the amount of the underlying judgment or is restricted to the amount of the policy limits. These cases all involve the so-called standard interest clause.[11] Some courts construing this clause have held it applicable to the underlying judgment while others have not. *Compare Dreshler,* 76 A.L.R.2d at 987–91 *with Dreshler,* 76 A.L.R.2d at 991–94.

The parties here have cited and discussed the one Arizona case in which a variation of this standard clause was construed. In *Basso v. Allstate Ins. Co.,* 118 Ariz. 139, 140–41, 575 P.2d 338, 339–40 (App.1977), Division Two of this court considered an insurance policy which provided for payment by the insurer of:

all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or *tendered* or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon.

In *Basso,* the issue was whether a tender had occurred. There was no question, though, that assuming a proper tender, the insurer had committed itself to payment of interest on the entire amount of the underlying judgment.

In this case, the USAC policy does contain a provision regarding the insurer's obligation to pay interest. Thus, we find the *Stuffle-*

---

**10.** USAC does not argue that interest should run only from the dates of the garnishment judgments.

**11.** That clause typically provides that the insurer will pay "all interest accruing after entry of judg-

ment until the company has paid, tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon." *Dreshler,* 76 A.L.R.2d at 987.

*beam* case initially distinguishable since that court did not mention any such provision in its policy. Nevertheless, we do not find *Basso* dispositive because the interest provision in our policy differs significantly from the provision construed in *Basso* and from the "standard clause" construed by the courts in the cited annotation.

■ In our policy, in a section entitled "COVERAGE EXTENSIONS," USAC contracted to pay on behalf of its insured:

> All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" we defend.

As a preliminary matter, we observe that such an interest payment provision is not mandated by any provision of the Act. Therefore, we have no statutory overlay guiding our interpretation, and we must interpret the provision in the same manner as we would interpret any other contractual provision. *Cf. A.J. Bayless Markets v. Ohio Casualty Ins. Co.*, 55 Ariz. 530, 531, 104 P.2d 145, 146 (1940) (holding that insurance contracts are to be construed as all other contracts where there is no ambiguity). In this context, our obligation is to give effect to the clear language of the insurance contract, and we must not invent or create an ambiguity and then resolve it to expand coverage. *Benevides v. Arizona Property & Casualty Ins. Guar. Fund*, 184 Ariz. 610, 613, 911 P.2d 616, 619 (App.1995).

We find no ambiguity in the USAC interest clause. It clearly provides that full judgment interest will be paid only in suits in which USAC assumes the defense. The purpose of the clause is to protect the insured when the insurer assumes the defense of a matter and therefore controls the timing of payment of any judgment which is entered against the insured. If the insurer delays payment on the judgment, for example by taking an appeal, it must pay for this delay by assuming responsibility for interest on the entire amount of the judgment, even though it exceeds policy limits. Conversely, if the insurer has forfeited its right to control by

not defending, it is relieved of its interest obligation to the extent the judgment exceeds the insurer's basic amount of obligation under the policy, namely the policy limits.

In this case, for reasons that do not appear in this record, neither Clegg nor TWS tendered the defense of the underlying action to USAC, and USAC did not provide a defense to either. Thus, the interest clause was never implicated. Because the clause is inapplicable, this case is effectively in the same posture as *Stufflebeam*; that is, there is no interest clause on which to base an·order requiring payment of interest on the entirety of an underlying judgment.

McCandless seeks to avoid the limitation imposed by the policy language by arguing that USAC should still be liable for interest because this is a case in which USAC *should* have provided a defense for its insured. Had USAC done as it was obligated, McCandless reasons, it would then have been required to pay interest. This argument is, in essence, a claim that USAC breached its duty under the policy to defend its insureds. However, we do not find that such a claim was an issue litigated or decided in the trial court and the issue is thus not before us.[12] *See Stewart v. Mutual of Omaha Ins. Co.*, 169 Ariz. 99, 108, 817 P.2d 44, 53 (App.1991).

We turn now to the subsidiary question: should interest on the second garnishment judgment against USAC run from September 15, 1995, the date of the underlying TWS judgment, or September 8, 1994, the date of the underlying Clegg judgment. We find that we do not need to decide this issue. We have determined that USAC is responsible for the Clegg judgment, with interest payable thereon from the date of that judgment. The Clegg judgment is the earlier of the two underlying judgments. When USAC pays its policy limits, together with judgment interest to satisfy that judgment, it will by virtue of that payment also satisfy the underlying TWS judgment, since there is only one amount collectible notwithstanding there are two judgments. Therefore, even if we were

---

**12.** Moreover, we question whether breach of a duty to defend could even be raised by McCandless in this garnishment action. McCandless has no assignment of a claim from Clegg or TWS of any cause of action under the policy. *See General Accident Fire & Life Assurance Corp. v. Little,* 103 Ariz. 435, 437, 443 P.2d 690, 693 (1968) (A judgment creditor in a garnishment proceeding has no direct right to maintain an action based on bad faith in an insurer's dealing with its policyholder.).

to hold that interest on the TWS judgment ran only from the date of that judgment, USAC would gain nothing thereby.

### III. Attorney's Fees on Appeal

McCandless has made a request for attorney's fees on appeal without explaining the basis of the request, nor citing any authority in support thereof. We therefore deny this request. *See* Rule 21(c), Arizona Rules of Civil Appellate Procedure; *City of Phoenix v. Maricopa County Superior Court*, 144 Ariz. 172, 177, 696 P.2d 724, 729 (App.1985) (denying request for attorneys' fees where no authority for such award cited).

### CONCLUSION

We affirm the portion of the garnishment judgments finding USAC liable for its policy limits of $750,000. However, we modify the portions of the garnishment judgments regarding interest and hold USAC liable for interest only on the sum of $750,000. We affirm the trial court's order that payment of either garnishment judgment satisfies the other to the extent the judgments are the same.

FIDEL, P.J., and PATTERSON, J., concur.