NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

KWASI GYAU, et al., *Plaintiffs/Appellants/Cross-Appellees*,

*v.*

TOTAL TRANSIT, et al., *Defendants/Appellees/Cross-Appellants*.

No. 1 CA-CV 22-0658
FILED 01-23-2025

Appeal from the Superior Court in Maricopa County
No.  CV2019-015593
The Honorable Bradley Astrowsky, Judge

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**

COUNSEL

Cohen Law Firm
By Larry J. Cohen
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Elardo Bragg Rossi & Palumbo PC, Phoenix
By John A. Elardo
*Counsel for Defendants/Appellees/Cross-Appellants*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Jennifer B. Campbell joined.

---

**B R O W N**, Judge:

¶1 Plaintiffs Kwasi and Yvonne Gyau challenge the superior court's grant of summary judgment on their breach of contract and bad faith claims against defendants Total Transit, Total Transit Inc., Total Transit Inc. d/b/a Discount Cab, and Auto Claim Inc. (collectively "Total Transit"). For its cross-appeal, Total Transit challenges the court's denial of its request for attorneys' fees. We conclude that summary judgment was improper on the Gyaus' claims for breach of contract and breach of the implied covenant of good faith and fair dealing. We affirm, however, the court's rulings on the Gyaus' claims for bad faith tort and punitive damages. Given our partial reversal and remand on the Gyaus' claims for breach of contract and breach of the implied covenant of good faith and fair dealing, Total Transit's cross-appeal is moot, and the superior court may consider whether either side is entitled to recover attorneys' fees based on the outcome of the case on remand.

**BACKGROUND**

¶2 In February 2015, Mr. Gyau was injured in a car accident while working as a taxi driver for Total Transit, which leased him the car he was driving. Mr. Gyau worked as an independent contractor for Total Transit, but the record does not include any specific terms of their contractual arrangement. Nonetheless, as Mr. Gyau testified in his deposition, Total Transit provided him "with insurance coverage [as] a condition of [him] agreeing to work for them."

¶3 The Gyaus obtained liability policy limits ($50,000) from the insurer of the other driver involved in the collision. Because those limits were not enough "to address Mr. Gyau's injuries and damages," the Gyaus sought to recover underinsured motorist ("UIM") benefits from Total Transit. In doing so, the Gyaus relied on a certificate of insurance filed with the Arizona Department of Transportation's insurance unit on September 3, 2014, which listed Scottsdale Indemnity Company as the insurer and stated that Total Transit had $1 million in automobile liability coverage and

$300,000 in "UM/UIM Bodily Injury" coverage on "any auto" at the time of an accident. The certificate also indicated that Total Transit was responsible for a $500,000 self-insured retention ("SIR"), "as per Policy Terms and Conditions." The policy provided by Scottsdale Indemnity included an SIR endorsement, which describes the $500,000 limit as "the amount of 'loss' or damage[s] [Total Transit] must pay first from claims or 'suits' otherwise covered under this policy," and that the SIR is a substitute for any applicable deductible. The endorsement states that Scottsdale Indemnity's "obligation under the policy applies only to the amount in excess of the [SIR] [l]imit."

¶4        Bill Wojtkowski, who worked as a claims examiner for Total Transit, acknowledged that the SIR was "an amount of money that a company agrees to have available to address claims." According to Julie Tyree, Total Transit's director of risk management and Wojtkowski's immediate supervisor at the time, the SIR covered any claims falling below the $500,000 threshold, and that those claims were handled "in house" by Total Transit. As part of the claims process, Wojtkowski explained in his deposition that he was tasked with investigating, evaluating, and settling liability claims, but for UIM claims, he would defer the final decision about whether there would be coverage to Tyree. Wojtkowski added that a UIM claim is one where one of the independent contractor drivers has been injured and the other driver did not have enough insurance coverage, but Wojtkowski could not recall whether he discussed the Gyaus' claim with Tyree.

¶5        In February 2017, counsel for the Gyaus' spoke with Tyree, who confirmed that UIM coverage in the amount of $300,000 was "available for Mr. Gyau's claim" from Total Transit.[1] Tyree later acknowledged in her deposition that she was responsible for the claims that were self-administered through the SIR and that standard operating procedures (in electronic form) for how to handle liability claims under the SIR had been established, but after the sale of one of Total Transit's subsidiary companies, "most of those documents" could not be located.

¶6        In urging Total Transit to confirm that UIM coverage was available to pay their claim, the Gyaus also referenced Total Transit's handling of another taxi driver's ("Mr. K") claim arising from injuries he incurred from a car accident. Mr. K had presented a claim for UIM benefits

---

[1]        The parties do not dispute, to the extent Total Transit may be found liable for payment of UIM benefits to Gyau, the maximum available for such payment is $300,000.

to Total Transit, asserting in part: "[I]t is our position (1) that Total Transit, Inc., provided underinsured motorist coverage, as it represented in the Certificate of Liability Insurance, (2) that this underinsured motorist coverage had limits of $300,000, and (3) that this coverage is Total Transit, Inc.'s responsibility, as it is within the scope of its [SIR]." Writing to counsel for the Gyaus, Wojtkowski "confirm[ed] the availability of underinsured motorist coverage at the time of [Mr. K.'s] loss," which "falls within the scope of our client's self-insured retention." Wojtkowski then stated, presumably referring to the Gyaus' claim, that "[i]n . . . an underinsured motorist claim, we will need documented confirmation that the policy limits of the third party carrier have been exhausted as well as confirmation of settlement." Both Mr. K's and Mr. Gyau's accidents occurred within the range of effective dates for Total Transit's insurance policy listed in the certificate of insurance filed with the Arizona Department of Transportation.

¶7         After Total Transit denied the Gyaus' claim, they sued Total Transit, seeking to recover UIM benefits and alleging bad faith. The court denied Total Transit's motion to dismiss under Arizona Rule of Civil Procedure 12(b)(6). After the parties participated in discovery, Total Transit moved for summary judgment, arguing: (1) it had no insurance contract with the Gyaus; (2) the certificate of insurance did not create or modify coverage; and (3) Tyree's post-accident statements did not create or modify coverage. The Gyaus moved for partial summary judgment asking the court to find as a matter of law that $300,000 in UIM coverage existed for the accident, again relying on the certificate of insurance, Tyree's statements, and the letter from the other taxi driver's claim.

¶8         The superior court granted Total Transit's motion. The court first noted that Total Transit was required by law to maintain liability and uninsured ("UM") coverage, but not UIM coverage. *See* A.R.S. §§ 28-4033(A)(2)(c), -4039(A). The court then determined that while a certificate of insurance "can be used by Arizona authorities to ensure appropriate insurance coverage exist[s] before granting permission to operate in this state . . . it is incorrect to say that [it] confirms the specific details of the policy outside of the minimum coverage required by the state." It further concluded that "[t]he mere words of [Tyree] are not enough to create liability where no contract exists." The court therefore granted summary judgment in favor of Total Transit on all the Gyaus' claims, finding that "there is no contract between [the Gyaus] and [Total Transit] and no duty . . . to provide the coverage claimed in [the Gyaus'] cause of action."

**¶9**        Total Transit applied to recover attorneys' fees under A.R.S. § 12-341.01(A), but the court declined to award fees, citing "the relatively novel issue presented in this matter."   After the court entered final judgment, the Gyaus timely appealed and Total Transit timely cross-appealed the denial of its fee claim.   We have jurisdiction under A.R.S. § 12-2101(A)(1).

**DISCUSSION**

**¶10**        Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."   Ariz. R. Civ. P. 56(a).  We review a grant of summary judgment de novo and view the evidence and reasonable inferences from it in a light most favorable to the Gyaus. *Zambrano v. M & RC II LLC*, 254 Ariz. 53, 58, ¶ 9 (2022).

## I.        Legal Nature of the Dispute

**¶11**        In defense of the superior court's summary judgment ruling, Total Transit focuses in part on the absence of any written insurance policy or contract providing coverage for UIM.  What Total Transit fails to acknowledge, however, is that its dispute with the Gyaus does not turn on any interpretation or enforcement of an insurance policy or insurance contract.  Instead, the viability of the Gyaus' claims depends on whether Total Transit treated the SIR as a self-administered fund to reimburse independent contractors for claimed losses resulting from injuries suffered while operating vehicles furnished by Total Transit.

**¶12**        The law recognizes the unique functions of an SIR in the context of insurance obligations:

> A "self-insured retention" (or "SIR") is an insurance arrangement whereby the insured takes all responsibility for dealing with claims up to a certain amount of loss.  This includes adjusting the claim, either itself as the insurer or through a third-party claims administrator, defending itself against the claim, and, if necessary, paying it.  Thus, as the term would suggest, the insured effectively self-insures up to the limit of the risk it has chosen to retain.

Vol 3, Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 16.09(3)(b) (LexisNexis); *see also City of Mesa v. Ryan in & for Cnty. of Maricopa*, ___ Ariz. ___, ___, ¶ 17, 557 P.3d 316, 320 (2024) ("A 'self-insured retention' is the amount specified in a liability insurance policy that must

be paid by or on behalf of the insured for a covered loss before coverage under the policy begins to apply for the claim or claims to which the self-insured retention applies.") (quoting Restatement of the L. of Liab. Ins. § 1(12) (Am. L. Inst. 2019)); *see also Transp. Indem. Co. v. Carolina Cas. Ins. Co.*, 133 Ariz. 395, 398, n.3, (1982) (equating self-retention provision to self-insurance, as a "form of deductible"); *id.* at 406 ("In such a situation the excess insurance clause should not be extended to cover an amount for which the insured [] has bargained to become a 'self-insurer.'" (citation and quotation omitted)).

¶13 Other jurisdictions have likewise found that "self-insurance" arrangements are not insurance contracts. *See Simmons v. Puu*, 94 P.3d 667, 682 (Haw. 2004) ("[S]elf-insurers are not insurers, inasmuch as they are 'not in the business of making contracts of motor vehicle insurance.'" (internal quotations and citations omitted)); *Cordova v. Wolfel*, 903 P.2d 1390, 1392 (N.M. 1995) ("[S]elf-insurance is a process of risk retention whereby an entity 'set[s] aside assets to meet foreseeable future losses.'") (citations omitted); *Hawkins v. Ford Motor Co.*, 566 S.E.2d 624, 629 (W. Va. 2002) ("A self-insured entity is not in the business of insurance."); *Wake Cnty. Hosp. Sys. Inc. v. Nat'l Cas. Co.*, 804 F. Supp. 768, 774 (E.D. N.C. 1992) (collecting cases and noting that a majority of jurisdictions have held that self-insurance programs are not insurance).

¶14 Though Total Transit did not provide the specific procedures it used in administering the SIR, Tyree described how Total Transit operated the SIR "in house" before Total Transit's other insurance provider would cover claims. Wojtkowski also explained that his duties involved examining claims and negotiating potential settlements. In describing the SIR, Wojtkowski stated that Total Transit would "assume the costs of [a] claim up . . . to [$500,000]." Under this arrangement, Total Transit did not receive premiums in exchange for guarantees to indemnify losses; the SIR reflects Total Transit's decision to cover and resolve potential liability claims on its own up to $500,000. The SIR is not an insurance contract, rather it reflects the arrangement Total Transit established to cover potential losses claimed by its injured taxi drivers before the Scottsdale Indemnity excess insurance is triggered. Thus, the principles of law specific to insurance contracts do not apply to the Gyaus' claims.

## II.      Breach of Contract Claim

### A.      Certificate of Insurance

¶15      The Gyaus argue that the certificate of insurance provided to the Department of Transportation "established the existence of [UIM] coverage."  As noted above, the certificate indicates that Total Transit had $300,000 of "UM/UIM Bodily Injury" insurance on "any auto," but that it was subject to a $500,000 self-insured retention.

¶16      Citing *McCandless v. United Southern Assurance Co.*, 191 Ariz. 167 (App. 1997) and *Drucker v. Greater Phoenix Transp. Co., Inc.*, 197 Ariz. 41 (App. 1999), the Gyaus contend that "when certification is given to Arizona authorities about insurance coverage in order to operate a vehicle in Arizona the afforded coverage is then available by operation of law to the extent described therein."  But those cases stand for the proposition that a policy listed in a certificate of insurance provided to the Department of Transportation can be modified by operation of law to conform to applicable statutory requirements.  *Drucker*, 197 Ariz. at 45, ¶ 20; *McCandless*, 191 Ariz. at 171.  The Gyaus have shown no statute that would require Total Transit to carry or provide UIM insurance, and thus neither *Drucker* nor *McCandless* apply.

¶17      Moreover, the certificate of insurance includes the following disclaimer:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.  THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

Standing alone, this certificate does not establish UIM coverage.  *Cf. Cont'l Cas. Co. v. Signal Ins. Co.*, 119 Ariz. 234, 238 (App. 1978) ("[A] Certificate of Insurance cannot contradict the terms of a policy; it only provides information as to the policy's contents.").

¶18      The certificate does, however, provide some indication as to what Total Transit covered, or at least what it represented would be covered, under the SIR, which was essentially a mechanism it used to

compensate independent contractors for the injuries they suffered because of auto accidents. Tyree acknowledged that it would have been her normal practice to review a certificate of insurance to ensure the contents were accurate, that she would have reported any errors to Total Transit's insurance broker, and that she did not report any such errors related to this certificate. Thus, even though the certificate is not an "insurance contract" between Mr. Gyau and Total Transit, at this stage of the litigation, it does serve as some evidence of what benefits Total Transit offered to its independent contractors, including Mr. Gyau, who were driving its vehicles.

## B.    Representations About UIM Coverage

¶19      Total Transit contends summary judgment is proper because it "never entered into an agreement to provide . . . [the Gyaus] with UIM coverage" and that "the only coverage provided under the self-insured retention amount is as is statutorily required, which is only UM and not UIM." Total Transit, however, points to no evidence that it informed the Gyaus or anyone else that its SIR was so limited.

¶20      The Gyaus, in contrast, offered their counsel's February 2017 letter in which he reminded Tyree that she had confirmed "there is [UIM] coverage in the amount of $300,000 available for Mr. Gyau's claim." Total Transit objected to this letter as irrelevant and "self-serving hearsay," but the superior court never made any ruling that the letter was inadmissible; instead, the court analyzed why it believed the statements were not sufficient to establish UIM coverage. By doing so, the court overruled Total Transit's objections as a matter of law. *See Compassionate Care Dispensary, Inc. v. Ariz. Dep't of Health Servs.*, 244 Ariz. 205, 211, ¶ 16 (App. 2018). And because Total Transit does not reassert its evidentiary objections in its answering brief, we consider the letter in analyzing whether Total Transit agreed, at least implicitly, to provide UIM coverage for its independent contractors driving Total Transit's vehicles. *See id.* (stating that the appellant had "waived appellate review of evidentiary rulings not specifically identified and argued within its opening brief").

¶21      The Gyaus also presented evidence that, about a month after their counsel's conversation with Tyree, claim examiner Wojtkowski confirmed in writing that UIM coverage was available for Mr. K's claim within the same policy period. Although Total Transit "denied" the contents of that letter, it presented no controverting evidence. Instead, similar to its argument on appeal, Total Transit contends that any evidence about the handling of Mr. K's claim is barred by Arizona Rule of Evidence

("Rule") 408, which states in part as follows: "Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim . . . (1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim." Ariz. R. Evid. 408(a)(1).

¶22 Total Transit cites no authority suggesting that evidence of settlement agreements in separate claims with separate parties fall under Rule 408's evidentiary barn. *See Dahlgren v. First Nat. Bank of Holdrege*, 533 F.3d 681, 699 (8th Cir. 2008) (noting that the Federal Rule of Evidence 408 "only applies to evidence of compromise offered to prove liability for or the amount of the claim that was compromised."); *cf. Ciolli v. Iravani*, 625 F. Supp. 2d 276, 286 (E. D. Penn. 2009) (acknowledging that federal circuits are split as to whether Federal Rule 408 applies only to the same case or claim being settled).

¶23 It is also not clear that the Gyaus seek to introduce this evidence to prove the validity of their claim; rather, it shows Total Transit's pattern of conduct in such cases. *See* Ariz. R. Evid. 408(b) (allowing courts to admit evidence of settlement for other purposes not listed in Rule 408(a)). In any event, even without this evidence, there are genuine issues of material fact as to whether Total Transit had offered to provide UIM coverage to Mr. Gyau as an independent contractor. Because the superior court did not address whether evidence about the handling of Mr. K's claim is precluded by Rule 408, on remand the court should address the extent to which such evidence will be admissible at trial.

¶24 The letter to Tyree and the letter from Wojtkowski constitute evidence that Total Transit represented to its taxi drivers that it provided them UIM benefits under the SIR. Total Transit argues nonetheless that the Gyaus cannot "create coverage based on statements made after an accident," citing *Farmers Ins. Co. of Arizona v. Zumstein*, 138 Ariz. 469, 474 (App. 1983). There, an insured asserted that the insurer should be estopped from denying coverage because its agent "misled [him] into believing he had coverage." *Id.* This court rejected that argument because "the policy provision in question . . . [was] unambiguous." *Id.* This court also recognized that "oral representations made subsequent to the accident will not create a claim of estoppel against the insurer because that doctrine cannot provide coverage for risks the policy does not cover by its terms." *Id.* at 474–75. But as we have explained, the SIR policy is not insurance. Further, there are no written terms for the SIR in our record and thus the Gyaus' UIM claim would fall entirely within the scope of the SIR. Absent

unambiguous evidence outlining what the SIR does and does not cover, which is absent on the record presented, *Zumstein* does not apply.

¶25 Total Transit also contends Tyree lacked authority to represent that UIM benefits were available. The scope of one's authority typically presents questions of fact for the jury. *Bud Antle, Inc. v. Gregory*, 7 Ariz. App. 291, 293 (1968). It does here as well, as Tyree testified that she did not answer to anyone above her in making claims handling and coverage decisions. Total Transit "denied" this evidence as well but only stated, without citation to the record, that Tyree was "limited in her capacity as an employee" and "does not own the company and does not have carte blanche authority to spend money any way she wants." That denial and those arguments, however, do not mandate the exclusion of Tyree's statement—when offered by the Gyaus—as an opposing party's statement. *See* Ariz. R. Evid. 801(d)(2).

¶26 Viewing the record in a light most favorable to the Gyaus, we cannot say that Total Transit is entitled to summary judgment. The Gyaus, based on the certificate of insurance and statements from Total Transit's representatives who were directly responsible for handling payments from the SIR, have shown there are genuine factual disputes on whether Total Transit had agreed to cover UIM claims through the SIR. We therefore vacate summary judgment on the Gyaus' claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

## III.    Bad Faith Claims

¶27 The Gyaus argue Total Transit acted in bad faith by arbitrarily refusing to pay UIM benefits. They contend that under Arizona law, breach of an express covenant is not a prerequisite to establishing a bad faith claim, and that their focus here is "on the matter in which [] handling of their UIM claim breached the implied covenant of good faith and fair dealing."

¶28 Every contract in Arizona implies a covenant of good faith and fair dealing, which "prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement." *Wells Fargo Bank v. Ariz. Laborers, Teamsters, and Cement Masons Local 395 Pens. Tr. Fund*, 201 Ariz. 474, 490, ¶ 59 (2002). A party may breach this covenant without necessarily breaching an express term of the agreement because the inquiry turns on whether the parties act faithfully "to an agreed common purpose and consisten[t] with the justified expectations of the other party." *Id.* at 492–93, ¶¶ 66, 69 (citation omitted). The typical remedy for breach of this covenant are contract damages.

*Burkons v. Ticor Title Ins. Co. of California*, 168 Ariz. 345, 355 (1991). But when this covenant is breached in contracts implicating certain special relationships (including between and insurer and insured), particularly those characterized by "elements of public interest, adhesion, and fiduciary responsibility," *Rawlings v. Apodaca*, 151 Ariz. 149, 158 (1986), the plaintiff may recover tort damages. But there is no insurer-insured relationship between Mr. Gyau and Total Transit; nor is there any indication in the record that Total Transit assumed any other special duties or fiduciary responsibilities or that any contracts of adhesion exist between the parties. *See id.* Without such relationships between Mr. Gyau and Total Transit, the Gyaus cannot recover tort damages.

¶29        The parties dispute whether Total Transit agreed to provide UIM benefits under the SIR, and the Gyaus presented evidence that Total Transit did not deny that UIM benefits were available until after this litigation commenced. Total Transit's refusal to provide such benefits after their representations that UIM coverage was available creates a genuine dispute of material fact on whether Total Transit breached the implied covenant of good faith and fair dealing. The Gyaus may recover *contract* damages if they establish a breach of that covenant at trial.

## IV.    Punitive Damages

¶30        To recover punitive damages, the Gyaus must show not only that Total Transit "engaged in tortious conduct of any kind, intentional or negligent—that is, acted with an 'evil hand,'" but also that "the defendant engaged in such conduct with an 'evil mind.'" *Swift Transp. Co. of Ariz. L.L.C. v. Carman in & for Cnty. of Yavapai*, 253 Ariz. 499, 506, ¶ 22 (2022). As discussed above, the Gyaus cannot pursue tort damages in this case. Thus, they cannot recover punitive damages. *Id.*; *see also Cont'l Nat'l Bank v. Evans*, 107 Ariz. 378, 382 (1971) (noting that punitive damages are unavailable on contract claims).

## V.    Cross-Appeal

¶31        In its cross-appeal, Total Transit challenges the denial of its request for attorneys' fees incurred in the superior court. Our decision vacating summary judgment in part moots that denial. The court may consider whether either side is entitled to recover attorneys' fees based on the outcome of the case.

**CONCLUSION**

**¶32** We affirm in part, vacate in part, and remand for further proceedings consistent with this decision. In our discretion, we deny Total Transit's request for attorneys' fees incurred in this appeal under A.R.S. § 12-341.01(A), and because both parties have prevailed on appeal in part, we decline to award taxable costs.



AMY M. WOOD • Clerk of the Court
FILED:          JR

12